UNITED SALT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 82621. Filed May 17, 1963

*Cornelius O. Ryan*, for the petitioner.
*John D. Laflin*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioner's income tax for the years 1953, 1954, and 1955 in the amounts of $9,678.76, $21,154.52, and $21,828.72, respectively. In an amendment to his answer the respondent claimed an increase of $2,029.07 in the deficiency for 1953, or a total deficiency for that year of $11,707.83.[1] The issues are (1) the correct computation of gross income in the years before us from petitioner's salt-mining operations

---

[1] The increase in the 1953 deficiency is based upon facts which have been stipulated. In the statutory notice of deficiency, the respondent computed the allowable depletion allowance for 1953 ($23,784.13) by using a "gross income from the property" of $475,- 682.71. It was subsequently stipulated that the average net sales price of bulk salt for 1953 was $5.4714 and that 84,445.71 tons of salt were sold in 1953. Based on these stipulated amounts, respondent computed "gross income from the property" (less royalties of $35,843.31) in the amount of $426,192.95, and recomputed the allowable depletion allowance in the amount of $21,309.65.

for the purpose of computing the percentage depletion allowance; and (2) the amount of taxable income for the purpose of computing the statutory 50-percent limitation on the allowable percentage depletion. The second issue arises only if the first issue is decided for the petitioner, and, in any event, the second issue applies only to the years 1954 and 1955.

FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

United Salt Corporation, hereinafter called petitioner, is a Texas corporation with its principal office in Houston, Tex. Petitioner filed its Federal income tax returns for the years here involved with the district director of internal revenue, Austin, Tex. During the years here involved the petitioner kept its books and records on an accrual basis.

Petitioner produces salt (sodium chloride) by dry mining (rock salt mine) at its plant at Hockley, Tex., and is entitled to the percentage depletion deductions at the annual rate of 5 percent for 1953 and 10 percent for the years 1954 and 1955.

The general pattern of petitioner's production from its dry-mining operation during the years here involved was as follows: Rock salt was mined in essentially the same manner as that employed by other rock salt companies in the United States. Petitioner mines rock salt by undercutting, drilling, and blasting at a level of approximately 1,600 feet underground. The salt after blasting, which is in various sizes ranging from fine grains to chunks of approximately 400 or 500 pounds in weight, is transported from the face of the mine to a storage pile adjacent to the foot of the mine shaft. The salt is then transported from the storage pile to the surface of the ground by a 2-ton skip which travels up and down the mine shaft. Upon reaching the surface, the salt is dumped directly from the skip into a hopper leading to the primary crusher. In its passage through the hopper leading to the primary crusher, the salt passes over a series of bars, called a grizzly, which permits the passage of all particles less than approximately 1 inch in diameter, so that these do not go to the primary crusher but are separated at this point by the grizzly. The passage of the large pieces through the primary crusher results in their reduction to particles ranging in size from approximately 1 inch in diameter down to fine grains. The salt which has gone through the primary crusher is combined with the salt which bypassed the primary crusher by going through the grizzly, and is transferred by conveyor belt to a screening plant. The primary screen in the screening plant permits the passage of all particles less than approximately five-eighth of an inch in diameter. Under the general pattern of operation the salt which does not go through the primary

screen passes through a second crushing operation which reduces the particles to sizes ranging from approximately five-eighths of an inch in diameter down to fine grains. The salt is then conveyed over a series of screens which separates the salt into seven different grades according to size, which, in the descending order of size are designated as number 2, number 1, A, C, little C, stock salt, and feed mix. The salt is conveyed by gravity or a belt conveyor to various bins, in each of which is stored one of the sizes named above. As demand for stock salt and feed mix warrants, the larger grades (through "little C") are conveyed from the bins to a roller mill to be ground into stock salt and feed mix.

Some of the salt is sold in bulk, some of it is placed into sacks for loading and shipment, and some of it is pressed into blocks for shipment. Mineral and/or a chemical drying agent are added to some of the salt prior to sale, according to the requirements of customers. Ordinarily, petitioner's coarse grades of salt are sold in bulk and its fine grades in sacks. However, some coarse grade salt is sold in sacks and some fine grade salt is sold in bulk.

In 1953, 1954, and 1955 petitioner sold the following amounts (in tons) of salt:

| | 1953 | 1954 | 1955 |
|---|---|---|---|
| Bulk salt | 20, 666. 83 | 20, 275. 04 | 19, 890. 44 |
| Bulk salt in buyers' bags | 5, 600. 10 | 5, 706. 65 | 5, 350. 83 |
| Sacked salt: | | | |
| Plain | 45, 369. 00 | 52, 959. 76 | 45, 170. 38 |
| Mineral | 1, 036. 18 | 1, 195. 17 | 822. 08 |
| Block salt: | | | |
| Plain and broken | 4, 165. 63 | 4, 477. 27 | 4, 427. 11 |
| Mineral and custom | 1, 490. 88 | 1, 576. 56 | 1, 579. 71 |
| Sulfur | 6, 095. 73 | 5, 115. 20 | 4, 987. 31 |
| Brick salt | 21. 36 | 31. 66 | 34. 47 |
| Total tons sold | 84, 445. 71 | 91, 337. 31 | 82, 262. 33 |

The following schedule shows petitioner's gross sales for the years 1953, 1954, and 1955:

| | Gross sales 1953 | Gross sales 1954 | Gross sales 1955 |
|---|---|---|---|
| Mined salt: | | | |
| Bulk salt | $179, 947. 60 | $198, 797. 42 | $190, 315. 23 |
| Bulk salt in buyers' bags | 30, 071. 75 | 30, 668. 49 | 28, 708. 68 |
| Sack salt: | | | |
| Plain | 657, 349. 09 | 764, 186. 25 | 709, 759. 38 |
| Mineral | 44, 347. 78 | 46, 772. 97 | 33, 452. 27 |
| Block salt: | | | |
| Plain and broken | 60, 237. 51 | 76, 264. 10 | 71, 596. 40 |
| Mineral and custom | 82, 842. 01 | 73, 081. 90 | 83, 444. 52 |
| Sulfur | 119, 759. 69 | 114, 485. 60 | 116, 232. 05 |
| Brick salt | 1, 241. 02 | 1, 996. 24 | 1, 939. 31 |
| Total mined salt | 1, 175, 796. 45 | 1, 306, 252. 97 | 1, 235, 447. 84 |
| Purchased salt | 39, 319. 04 | 50, 213. 97 | 38, 242. 61 |
| Gross sales, mined and purchased salt | 1, 215, 115. 49 | 1, 356, 466. 94 | 1, 273, 690. 45 |

Petitioner's net sales (gross sales less outward freight and allowances) for the years 1953, 1954, and 1955 were as follows:

| | 1953 | 1954 | 1955 |
|---|---|---|---|
| Mined salt: | | | |
| Bulk salt | $113,077.62 | $113,496.46 | $111,986.08 |
| Bulk salt in buyers' bags | 28,739.71 | 29,146.59 | 27,600.40 |
| Sacked salt: | | | |
| Plain | 546,948.23 | 650,379.45 | 573,916.89 |
| Mineral | 41,581.28 | 43,631.83 | 30,908.63 |
| Block salt: | | | |
| Plain and broken | 52,650.11 | 67,903.58 | 63,134.87 |
| Mineral and custom | 73,744.17 | 68,064.50 | 78,498.88 |
| Sulfur | 111,870.30 | 109,372.61 | 108,127.67 |
| Brick salt | 1,236.01 | 1,968.22 | 1,884.66 |
| Total mined salt | 969,847.43 | 1,083,963.24 | 996,058.08 |
| Purchased salt | 35,867.97 | 44,673.37 | 31,610.08 |
| Net sales mined and purchased salt | 1,005,715.40 | 1,128,636.61 | 1,027,668.16 |

The average net sales price per ton of all bulk salt sold by petitioner was $5.4714 in 1953 ($113,077.62 divided by 20,666.83), $5.5978 in 1954 ($113,496.46 divided by 20,275.04), and $5.6301 in 1955 ($111,986.08 divided by 19,890.44).

Direct mining and extraction costs incurred by petitioner in 1953, 1954, and 1955, as shown by the annual audit reports, were as follows:

| Year | Tonnage produced | Total cost | Cost per ton |
|---|---|---|---|
| 1953 | 85,158.64 | $202,762.73 | $2.3810 |
| 1954 | 90,717.66 | 204,430.69 | 2.2535 |
| 1955 | 83,080.85 | 200,399.32 | 2.4121 |

Direct milling costs incurred by petitioner during the years 1953, 1954, and 1955, as shown by the annual audit reports, were as follows:

| Year | Tonnage produced | Total cost | Cost per ton |
|---|---|---|---|
| 1953 | 85,158.64 | $82,243.62 | $0.9658 |
| 1954 | 90,717.66 | 96,706.27 | 1.0660 |
| 1955 | 83,080.85 | 96,217.49 | 1.1580 |

Indirect mining and milling costs incurred by petitioner in 1953, 1954, and 1955, as shown by the annual audit reports, were as follows:

| Year | Tonnage produced | Total cost | Cost per ton |
|---|---|---|---|
| 1953 | 85,158.64 | $53,558.90 | $0.6289 |
| 1954 | 90,717.66 | 54,811.00 | .6042 |
| 1955 | 83,080.85 | 38,472.52 | .4630 |

The production costs (exclusive of royalties) after screening of all rock salt sold in 1953 through 1955 were $270,226.42, $292,878.74, and $276,332.39, respectively.

Petitioner claimed depletion allowances in its returns for 1953, 1954, and 1955 of $35,587.50, $81,218.64, and $75,065.55, respectively. Petitioner computed these amounts of depletion allowances as follows:

*1953*

| | |
|---|---:|
| Net sales of mined salt | $970, 097. 43 |
| Less: (Sacking and sewing cost; minerals and chemicals; pressing costs; block cartons; royalties | 258, 347. 49 |
| Net realization | 711, 749. 94 |
| | . 05 |
| Depletion allowance | 35, 587. 50 |

*1954*

| | |
|---|---:|
| Net sales of mined salt | 1, 083, 963. 24 |
| Less: (Generally similar to 1953 categories) | 271, 776. 86 |
| Net realization | 812, 186. 38 |
| | . 10 |
| Depletion allowance | 81, 218. 64 |

*1955*

| | |
|---|---:|
| Net sales of mined salt | 996, 058. 08 |
| Less: (Generally similar to 1953 categories) | 245, 402. 55 |
| Net realization | 750, 655. 53 |
| | . 10 |
| Depletion allowance | 75, 065. 55 |

Respondent disallowed a portion of these claimed allowances in each year as follows: 1953, $11,803.37; 1954, $40,681.78; and 1955, $41,978.30. Respondent's explanation in each year for the partial disallowances was that, "It is determined that for the purpose of computing allowable depletion, gross income from the property should be based on the total tonnage of salt sold, figured at the unit price of plain bulk salt." Respondent's explanation also stated that the "amounts of depletion allowed as deductions in the years 1954 and 1955 have been limited to 50 per cent of the net income from the property as determined herein." Respondent allowed depletion allowances for the years 1953, 1954, and 1955 in the respective amounts of $23,784.13, $40,536.86, and $33,087.25.

At the trial respondent conceded that under the theory advanced by him, i.e., that the proper cutoff point for percentage depletion purposes was immediately after petitioner's rock salt had passed through the primary crusher, the 50-percent limitation would not apply for the years 1954 and 1955.

**364**

However, respondent, in the second amendment to his answer, claimed increased deficiencies for 1954 and 1955 in the event that this Court should determine that the petitioner's cutoff point for percentage depletion purposes is "immediately after screening and milling," rather than immediately after the product passes through the primary crusher. Respondent alleged that, in that event, the 50 percent of taxable income limitation imposed by section 613(a) of the Internal Revenue Code of 1954 would apply in 1954 and 1955. Respondent alleged the depletion allowances for 1954 and 1955, if limited to 50 percent of the taxable income from the property, would be $33,920.21 and $16,394.19, respectively.

OPINION

Section 613(a) of the Internal Revenue Code of 1954 [2] provides that "In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid to or incurred by the taxpayer in respect of the property." Section 613(b)(4) provides that for sodium chloride or salt the depletion rate is 10 percent, which is the applicable rate for petitioner's years 1954 and 1955. Petitioner's depletion rate for 1953 is 5 percent under section 114(b)(4)(A)(i) of the Internal Revenue Code of 1939.

Certain definitions are found in section 613(c) of the Internal Revenue Code of 1954. Section 613(c)(1) provides that, "The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining." Section 613(c)(2) states that "The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles." Section 613(c)(4) defines "ordinary treatment processes" in certain categories of minerals,[3] but does not include sodium chloride.

---

[2] This section in the 1954 I.R.C. is essentially the same as its counterpart (sec. 114) in the 1939 I.R.C. All section references will be to the 1954 I.R.C. unless otherwise noted.
[3] SEC. 613. PERCENTAGE DEPLETION.
(c) DEFINITION OF GROSS INCOME FROM PROPERTY.—For purposes of this section—
\* \* \* \* \* \* \*
(4) ORDINARY TREATMENT PROCESSES.—The term "ordinary treatment processes" includes the following:
(A) In the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment;
(B) in the case of sulfur recovered by the Frasch process—pumping to vats, cooling, breaking, and loading for shipment;

Respondent argues that "petitioner's 'mining' activity for depletion purposes ceases immediately upon obtaining the first, cheapest, least processed marketable mineral product." That product, argues the respondent, is obtained by petitioner immediately after the rock salt has been processed through the primary crusher (which reduced the rock salt to particles ranging from about 1 inch in diameter down to grain size) and prior to grade screening, because at that point the rock salt has become ready for industrial use. Petitioner objects to this cutoff point and argues, instead, that it is "entitled to determine the 'gross income from the property,' on the basis of its gross income from the sale of all of its salt products f.o.b. plant loaded for shipment less (a) returns, (b) allowances, (c) freight, (d) purchased salt for resale, and (e) royalties."

In *United States* v. *Cannelton Sewer Pipe Co.*, 364 U.S. 76, the taxpayer, an integrated miner-manufacturer of burnt clay products from fire clay and shale, argued that depletion should be based upon its first commercially marketable products (sewer pipe and other vitrified articles). The Supreme Court, after reviewing the pertinent legislative history, concluded "that Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product *if marketable in that form*, and not on the value of the finished articles." (Emphasis added.) The record showed that large sales of raw fire clay and shale were made and that a substantial market existed for the raw minerals. The Court then stated:

Proof of these sales is significant not because it reveals an ability to sell profitably—which the respondent could not do—but because the substantial tonnage being sold in a raw state provides conclusive proof that, when extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption—in short, they have passed the "mining" state on which the depletion principles operate. It would be strange, indeed, to ascribe to the Congress an intent to permit each miner to adopt processes peculiar to his individual operations. Depletion, as we have said, is an allowance for the exhaustion of capital assets. It is not a subsidy to manufacturers or the high-cost mine operator. The value of respondent's vitrified clay products, obtained by expensive manufacturing processes, bears little relation to the value of its minerals. The question in depletion is what allowance is necessary to permit tax-free recovery of the capital value of the minerals.

(C) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment;

(D) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores; and

(E) the pulverization of talc, the burning of magnesite, and the sintering and nodulizing of phosphate rock.

In *Riddell v. Monolith Portland Cement Co.*, 371 U.S. 537, the Court again faced this problem. In that case the taxpayer mined limestone, crushed it, transported the crushed product to its plant, and there, through the addition of other materials and further processing, manufactured the limestone into cement which it sold. The Supreme Court held that the taxpayer's "mining" terminated when its product reached the crushed limestone stage [4] and that its basis for depletion was its constructive income from crushed limestone, i.e., when it first became suitable for industrial use or consumption.

In *Standard Realization Co. v. United States*, 289 F. 2d 247, the taxpayer mined quartzite and processed it to varying degrees of fineness. The mineral, in rock formation, was blasted to dislodge it, then blasted a second time to reduce the large rock fragments, which were then further disintegrated by high-pressure water jets and by the use of sledge hammers. The granular quartz was then subjected to primary and secondary washing operations. Following the washing operations the granular quartz was dried, then graded into nine sizes by the use of multiple vibrating screens and sold under a trade name. A portion of the grain-sized quartz particles was processed into similar sizes by grinding and sold in various degrees of fineness under another trade name. Taxpayer contended that its percentage depletion should be computed on the net selling price of all grades of its product in bulk and in bags, while the respondent argued that the cutoff point was the value of the crude unwashed silica sand which taxpayer obtained from its deposit.

The Court of Appeals for the Seventh Circuit found that the cutoff point for depletion purposes was after the washing process but before the grinding processes. The court stated that the "so-called treatment processes subsequently employed were to satisfy the demands of its customers for a more refined product, thereby increasing its sales and profits." After noting that the taxpayer sold in bulk more than 60 percent of its product without grinding or bagging, the court said that the "fact that the ordinary miner, like the taxpayer, as to the remainder employs further processes in order to obtain a better or more salable product does not alter or move forward the cut-off point." The court went on to hold that "the taxpayer's depletion base is the gross income it received from the sale in bulk of unground silica sand and what it would have received if all of its product had been sold in that form."

Applying these principles to the instant case, we believe that, for depletion purposes, the cutoff point in petitioner's operations is immediately after the grade screening, since it is at this point that the first

---

[4] In a footnote to the Supreme Court's opinion in the *Monolith Portland Cement Co.* case it is noted that "crushed limestone was not only 'marketable in that form' but, according to the Bureau of Mines Minerals Yearbook, 1952, p. 26" actual sales in significant amounts of crushed limestone were made in the year in question.

commercially marketable product is obtained. Petitioner's executive officer, who showed a wide familiarity with the operation of salt mines throughout the United States and Canada, testified that "All mines screen their salt." He testified further that during the years 1953, 1954, and 1955 the petitioner did not sell any salt immediately after the primary crusher and prior to screening, and that he did not know of any rock salt mine operator in the United States or Canada that did so. In each of the years 1953, 1954, and 1955 the petitioner sold approximately 20,000 tons of salt in bulk form. Petitioner's bulk salt consisted of *screened* salt of various grades which, after screening, had sometimes been remixed. Ordinarily, the bulk salt sold by petitioner consisted of the coarser grades of salt, though some of its finer grades were also sold as bulk salt in the years here involved.

To show that petitioner's rock salt immediately after the primary crusher, when it consisted of particles ranging in size from approximately 1 inch in diameter down to fine grains, was marketable in that form, the respondent relies heavily upon the testimony of the assistant manager of the chemical manufacturing department of Champion Papers, Inc. This witness testified that in each of the years 1953 through 1955 his corporation purchased approximately 3,000 tons of bulk salt for use in its manufacturing operations (which included the processing of chlorine from salt) and that this bulk salt "varied anywhere from dust up to approximately one inch." The witness referred to the type of salt used by his plant in its production as "mine-run fine," and in terms of the various stages in petitioner's operations, the witness identified as "mine-run fine" the rock salt that passed through the grizzly and the rock salt just after passing through the primary crusher.[5]

We do not believe that the testimony of this witness establishes, as respondent contends, that petitioner's product was first ready for industrial use when it passed through the primary crusher. Petitioner's executive officer testified that the so-called mine-run salt was "actually a screen salt with the grades put back together from the bin and loaded in a truck or car or a barge." Respondent's witness, who admitted he was not familiar with petitioner's mining operations and, in fact, was testifying merely as to his experience gained as a purchaser of salt, testified that he did not know whether the salt Champion purchased was a mixture of various particles of screened salt. Another of respondent's witnesses admitted on cross-examination that, as to the term "mine-run fines," "there is a variation in the understanding of what that term means." He also agreed that it was

---

[5] We have outlined the several stages of petitioner's operations in our findings of fact. The grizzly is a series of bars which permit passage of all particles less than approximately 1 inch in diameter so that they do not have to go through the primary crusher. The salt which bypasses the primary crusher is then combined with the salt which has gone through the primary crusher.

the practice in the salt industry, particularly in the Louisiana mines, to designate as "mine-run fine" anything they found expedient to sell at a low price.

The witnesses generally defined mine-run fines as anything from dust up to 1-inch particles and it is true this would describe salt before grade screening. However, the evidence shows that mine operators do not normally sell any salt until after the grade screening process. It may well be that some manufacturers could use unscreened salt in their specific operations but there is no general substantial market for such unscreened salt. The statute makes the cutoff point after the ordinary treatment process normally applied by mine operators. We think that point was reached after the grade screening.

Petitioner's contention that it is entitled to determine the "gross income from the property" on the basis of its gross income from the sale of *all* its salt products f.o.b. plant loaded for shipment less returns and allowances, freight, purchased salt for resale, and royalties, is untenable in view of the principles of the *Cannelton* case and the cases subsequent to it. Clearly, the costs of sacking and sewing are not includable in the depletion base. *Standard Realization Co. v. United States, supra.* Nor can the processes be included which petitioner employs to obtain a more refined and expensive product. For instance, the block salt sold by petitioner was its finest grade of salt which was screened out, then pressed into blocks by hydraulic press. Substantial amounts of block salt were sold by the petitioner in each of the years 1953, 1954, and 1955. The cost of these additional processes is shown by the stipulated net sales figures of petitioner. For instance, in 1954 the average net sales price per ton of bulk salt sold by petitioner was $5.5978 ($113,496.46 divided by 20,275.04 tons), while the average net sales price per ton for block salt was as follows: Plain and broken, $15.1663 ($67,903.58 divided by 4,477.27 tons); mineral and custom, $43.1728 ($68,064.50 divided by 1,576.56 tons); and sulfur, $21.3819 ($109,372.61 divided by 5,115.20 tons). We believe that these processes employed by petitioner after it obtains its first marketable product, i.e., immediately after screening, must be excluded.

We find that petitioner's depletion base is the gross income it would have received if it had sold all of its salt in the years before us as bulk salt. It has been stipulated that the average net sales price per ton of all bulk salt sold by petitioner in 1953, 1954, and 1955 was $5.4714, $5.5978, and $5.6301, respectively. Petitioner's "gross income from the property" within the meaning of section 613(a) of the Internal Revenue Code of 1954 is, therefore, the total tonnage of all salt sales in each year multiplied by the average sales price per ton of bulk salt sold in that particular year.

Petitioner argues that the respondent, in computing "gross income from the property," used an incorrect amount as the average sales price of salt sold by petitioner in the years 1953, 1954, and 1955. As indicated earlier in the opinion, the respondent computed "gross income from the property" by multiplying the total tonnage of all salt sold by petitioner each year by the average net sales price for a ton of bulk salt.[6] Bulk salt was screened salt,[7] and respondent therefore used the stipulated average sales price per ton of bulk salt in reconstructing petitioner's income at the cutoff point. But petitioner objects to this figure because most of the bulk sales it made were in the coarser grades which were priced much less than sales of finer grades; also there were certain factors present in respect to some bulk sales [8] that served to depress the price, so the average price it actually received for bulk sales should not be taken as representative of the value of petitioner's production when considered in bulk form.

As pointed out earlier we are here trying to find what petitioner would have received if all of its screened salt had been sold in bulk form. We know of no better way to compute this figure than to take the average price it actually received for bulk sales and consider this as the price it would have received if all sales were in bulk. The price used is a representative average price which properly reflects such governing factors as competitive pricing and freight differentials with respect to a certain percent of bulk sales.

Respondent argues that if we should find, as we do, that the cutoff point for depletion purposes occurs immediately after screening, then the petitioner's depletion allowance for 1954 and 1955 will be limited to 50 percent of taxable income from the property.[9] Section 613(a) of the Internal Revenue Code of 1954, which provides for the depletion allowance based upon a percentage (here 10 percent) of the "gross income from the property," also provides that "Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion)." Respondent's regulations define "taxable income from the property" as " 'gross income from the property' * * * less allowable deductions (excluding any deduction for depletion) which are attributable to the mineral property, including allowable deductions attributable to ordinary treatment processes and mining transportation." The regulations add that "These deductions include administrative and financial overhead, operating expenses, selling expenses, depreciation, taxes,

---

[6] It is stipulated that the average sales price per ton of all bulk salt sold by petitioner in 1953, 1954, and 1955 was $5.4714, $5.5978, and $5.6301, respectively.

[7] Petitioner's executive officer testified that ordinarily coarse grades were sold in bulk, but that some fine grades were also sold in bulk.

[8] These factors appear to be no more than the giving of cheap prices to some large purchasers to meet competition or compensate for freight differentials.

[9] Respondent concedes that the limitation will not apply to 1953 due to the lower depletion rate (5 percent) under sec. 114, I.R.C. 1939.

losses sustained, etc." and that "Expenditures which may be attributable to both the mineral property upon which depletion is claimed and other activities shall be fairly apportioned." Sec. 1.613–4, Income Tax Regs.

We have found above that the cutoff point in petitioner's operations occurred immediately after screening and that the "gross income from the property" was the total tonnage of all salt sales in each year multiplied by the average sales price per ton of bulk salt sold in that year. The significance of the cutoff point is that, in petitioner's operations, it marks the end of the "mining" stage on which the depletion principle operates, and it is at that point that we must compute both "gross income from the property" and "taxable income from the property." To determine the petitioner's "taxable income from the property" it is evident that "gross income from the property" must be reduced only by those expenditures which are attributable to the mining stage, i.e., through screening, and that some allocation must be made of petitioner's general, administrative, and selling expenses which apply to both the mining and nonmining stages. Respondent's regulations recognize the need for this allocation and provide that the allocation should be a fair one. See *Tennessee Consolidated Coal Co.*, 15 T.C. 424; see also *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90.

Both parties here recognize the need for some allocation of indirect expenses between mining and nonmining stages and both have presented in evidence their computations of "taxable income from the property" reflecting such allocation. It has been stipulated that the administrative and general expenses to be allocated to mining and nonmining activities in 1954 and 1955 are $151,203.44 and $151,883.33, respectively, and the selling expenses to be allocated to mining and nonmining activities in 1954 and 1955 are $96,391.04 and $102,678.76, respectively.

Respondent allocated the general and administrative expenses to mining and nonmining activities for 1954 and 1955 on the basis of the total cost of sales of all rock salt sold. Since the method is the same for both years, it will suffice for explanatory purposes to limit our discussion to 1954. The computations of both petitioner and respondent show that the total cost of sales for 1954 (exclusive of royalties) was $732,428.49. Respondent's computation (Exhibit L) shows that this total consists of the following items: Production costs through screening, $292,878.74; selling expenses, $96,391.04; and other direct costs, $343,158.71. Since the production costs of $292,878.74 represent 39.99 percent of the total cost of all rock salt sold, respondent allocated 39.99 percent of the general and administrative expenses, or $60,466.25, to the "mining" stage of petitioner's operations.

Respondent used a different method to allocate selling expenses to

mining and nonmining activities. Net sales, rather than cost of sales, were used as a basis for the allocation. Respondent's computation (Exhibit L) shows total selling expenses to be allocated in the amount of $116,289.49 (representing direct selling expenses of $96,391.04 and indirect expenses of $19,898.37). Net sales of bulk salt in 1954 ($113,496.46) amounted to 10.056 percent of the petitioner's total net sales of salt in that year ($1,128,636.61). Respondent's computation then proceeds as follows:

| | |
|---|---|
| Selling expenses allocated to *actual* bulk sales (10.056 percent of $116,289.41) | $11, 694. 06 |
| Tons of *bulk* salt sold____tons__ | 20, 275. 04 |
| Selling expenses per ton ($11,694.06 divided by 20,275.04 tons) | $0. 577 |
| Tons of all salt sold by petitioner____tons__ | 91, 337. 31 |
| Selling expenses allocated to "Mining" activities, i.e., through screening (91,337.31 tons × $0.577) | $52, 701. 63 |

Respondent then arrives at the "taxable income from the property" and the 50-percent depletion limitation, as follows:

| | |
|---|---|
| Production costs through the screening operation, i.e., the mining stage | $292, 878. 74 |
| Administrative and general expenses allocated to the mining stage__ | 60, 466. 25 |
| Selling expenses allocated to the mining stage | 52, 701. 63 |
| Total deduction from "gross income from the property" | 406, 046. 62 |
| "Taxable Income from the Property" ($473,887.05 minus $406,046.62) | 67, 840. 43 |
| Percentage depletion (10 percent of $473,887.05) | 47, 388. 71 |
| Limitation—50 percent of taxable income | 33, 920. 21 |
| Allowable depletion for 1954 | 33, 920. 21 |

Using the same approach for 1955 the respondent computed the petitioner's "taxable income from the property" in the amount of $32,788.38, which limited petitioner's depletion allowance to 50 percent of this amount, or $16,394.19.[10]

Petitioner also makes an allocation of the general, administrative, and selling costs to mining and nonmining activities. Petitioner allocates the general and administrative expenses on the basis of direct costs of sales of its various products, while the allocation of selling expenses is made on the basis of net sales of its various products. Up to this point the parties use the same general approach in making the allocation. However, petitioner computes its taxable income from the

---

[10] Respondent's allocation to the mining stage of petitioner's operations in 1955 was as follows:

| | |
|---|---|
| Production costs through the screening operation, i.e., the mining stage | $276, 332. 39 |
| Administrative and general expenses allocated to the mining stage____ | 62, 044. 34 |
| Selling expenses allocated to the mining stage | 56, 678. 74 |
| Total deductions from "gross income from the property" | 395, 055. 47 |
| "Taxable income from the property ($427,843.85 minus $395,055.47)_ | 32, 788. 38 |
| Percentage depletion (10 percent of $427,843.85) | 42, 784. 39 |
| Limitation—50 percent of taxable income | 16, 394. 19 |
| Allowable depletion | 16, 394. 19 |

property by allocating to its mining stage, i.e., through the screening stage, only the general, administrative, and selling expenses which it attributes to the salt it *actually* sold in bulk form in 1954 and 1955.

Petitioner's computation (Exhibit 17) for the year 1954 will serve to demonstrate the shortcomings of this approach. The exhibit shows that petitioner sold 20,275.04 tons of bulk salt in 1954 and earned a gross profit on its bulk salt sales of $32,881.85,[11] so that its gross profit of bulk salt was $1.6218 per ton. Petitioner then multiplies the cost per ton of bulk salt sold by 91,337.31 tons, the total tonnage of salt in all forms sold in 1954, and arrives at the amount of $148,130.85 (which petitioner labels "Bulk Equivalent Gross Profit"). The remainder of the computation appears, as follows:

| | | |
|---|---:|---:|
| Bulk equivalent gross profit | | $148,130.85 |
| *Less* allocable expense: | | |
|     Administrative | [1] $15,883.65 | |
|     Selling | [2] 11,596.99 | |
| | | 27,430.64 |
| Net income | | $120,700.21 |
| Limitation—50 percent of net income | | $60,350.11 |

[1] Petitioner obtains this amount by first computing the ratio of cost of bulk sales ($80,614.61) to the total cost of all salt sales in 1954 ($769,829.43) and then applying this ratio to the total administrative expenses to be allocated ($151,203.44).

[2] This amount is obtained by computing the ratio of net sales of bulk salt ($113,496.46) to total net sales of all salt ($1,128,636.61) then applying this ratio to the total selling expenses to be allocated ($115,323.36).

There is no justification for allocating to petitioner's mining activities in 1954 and 1955 only those administrative and selling expenses which are attributable to actual bulk salt sales. The computation of "taxable income from the property" must proceed on the assumption that all of the salt of all kinds that was sold by petitioner in 1954 and 1955 passed through the mining stage, i.e., through screening. Each ton of salt sold by petitioner, in whatever form, must therefore bear its portion of the administrative and selling expenses. In 1954 and 1955 petitioner's bulk salt sales made up only 22.2 percent and 24.2 percent, respectively. It thus appears that petitioner's computation, in effect, permits about 75 percent of its salt sold in 1954 and 1955 to be processed through the screening stage without being burdened by administrative and selling expenses. The fallacy of this approach adopted by petitioner in computing its "taxable income from the property" is evident and must be rejected.

Without meaning to indicate that respondent's method would in all cases produce a fair allocation, we agree generally with respondent's method of allocating the administration and selling expenses in this

[11] Net bulk salt sales of $113,496.46 less cost of such sales, $80,614.61.

particular case. However, we believe he is in error in one of the steps in his computation. It has been stipulated that the selling expenses to be allocated to mining and nonmining activities during the years 1954 and 1955 are $96,391.04 and $102,678.76, respectively. Yet his computation (Exhibit L) shows total selling expenses to be allocated in 1954 and 1955 of $116,289.41 and $125,734.65, respectively. Using the 1954 figures for illustration purposes, it appears that respondent obtained the additional $19,898.37 ($116,289.41 minus $96,391.04) by first computing the percentage of selling expenses ($96,391.04) of total cost of sales ($732,428.49), or 13.16 percent, then applying this percentage to the administrative expenses for 1954 in the stipulated amount of $151,203.44. But a portion of this administrative expense has already been allocated to the mining stage, and it appears that respondent, by carving out a portion of this amount and adding it to the total selling expenses to be allocated, is really allocating that portion of the administrative expenses twice. Respondent fails to explain this step in his computation and we can perceive no justification for it. Under the circumstances, the amounts of $19,898.37 and $23,055.89 which respondent adds to the stipulated selling expenses for 1954 and 1955 must be eliminated in computing taxable income from the property in those years.

*Decision will be entered under Rule 50.*