The **WHITEHALL CEMENT MANUFACTURING COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 25310.**

United States District Court
E. D. Pennsylvania.
Jan. 25, 1965.

George Craven, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

John B. Leake, Philadelphia, Pa., for Allentown Portland Cement Co.

Drew J. T. O'Keefe, U. S. Atty., Francis R. Crumlish, Asst. U. S. Atty., Philadelphia, Pa., Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston,

David A. Wilson, Jr., Thomas F. Field, Dept. of Justice, Washington, D. C., for defendant.

GRIM, District Judge.

The problem this tax case presents is one of defining "gross income from mining" in determining the depletion allowance of an integrated miner-manufacturer of portland cement. Plaintiff seeks to recover certain income and excess profits taxes for the years 1951 through 1956. Being a miner of cement rock, plaintiff is entitled to a percentage depletion deduction from its income (10 per cent under the 1939 Revenue Code, 15 per cent under the 1954 Code).

To make cement, plaintiff quarries its rock, crushes it to a small size, adds certain ingredients, burns the mixture in a kiln at intense heat, adds other ingredients and grinds the resulting mass into a fine powder, which is known as portland cement. It is agreed in this case that the finished portland cement is the first commercially marketable product in plaintiff's mining-manufacturing business.

There is an inherent difficulty in determining the base figure to which the depletion allowance is applied in a case, such as the present one, where a taxpayer uses the product of its own mining to manufacture finished cement. The difficulty arises from the fact that miners as such are entitled to a depletion allowance against their income tax liability while as manufacturers they are not so entitled. In an integrated situation, such as that in the present case, almost all processes relate at least to some extent to mining and, at the same time, they relate to some extent to manufacturing. Difficult as it may appear to be, for depletion purposes, a line must be drawn between what is to be considered mining and what is to be considered manufacturing.

In the Revenue Act of 1943 amending the 1939 Revenue Code, Congress attempted to resolve the miner-manufacturer problem by providing:

"'(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining", as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products.'" 58 Stat. 21, 45 (1944).

The interpretation of this section was before the courts in a case involving the cement industry in Dragon Cement Co. v. United States, 244 F.2d 513 (1st Cir. 1957), cert. denied 355 U.S. 833, 78 S. Ct. 50, 2 L.Ed.2d 45 (1957), and in other cases which followed it. It was decided in these cases that in the cement industry the base figure upon which to allow depletion under the 1943 Revenue Act was the gross income of each company, that is, the total of the sales of the finished product, cement, and that no attempt need be made to draw a line within the mining-manufacturing processes to find a base upon which to apply the depletion allowance.[1]

In 1960 Congress amended the law establishing the base for depletion purposes in an integrated mining-manufacturing business. In place of the 1943 definition of mining as "the ordinary treatment processes normally applied by

---

1. The Supreme Court disagreed with this when the question finally reached it and decided that the line must be drawn and the depletion base ascertained at the point "where the mineral first became suitable for industrial use or consumption" and that "the constructive income from the raw material product, if marketable in that form [although possibly not actually marketed] and not * * * the value of the finished articles" must be used as the income base for depletion purposes. See United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S. Ct. 1581, 4 L.Ed.2d 1581 (1960); Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963).

mine owners or operators * * * to obtain the commercially marketable mineral product or products", there was substituted for the cement industry a specific and exclusive list of processes to be considered mining. These processes were listed as "all processes (other than preheating of the kiln feed) applied prior to the introduction of the kiln feed into the kiln, but not including any subsequent process."[2]

By this 1960 amendment Congress apparently attempted to establish the market value of the cement rock at the point where it is to be fed into the kiln as the base for the application of the depletion allowance. However, since some integrated miner-manufacturers of portland cement such as plaintiff have no sales at the kiln feed processing stage, an arbitrary method had to be devised to determine the market value of the cement rock at this stage. This method is set forth in Treasury Regulation 118 which provides that

" * * * if the product is * * processed (other than by the ordinary treatment processes * * *) 'gross income from the property' means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied * * *. If there is no such representative market or field price (as of the date of the sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product

resulting from any process or processes * * * minus the costs and proportionate profits attributable to * * * the processes beyond the ordinary treatment processes * * *."[3]

In view of the 1960 statutory definition of mining it must be concluded that this means that where there is no market value of a product until the finished stage (like the present case), the base for the application of the depletion allowance is the gross income, that is, the total market price of the finished portland cement[4] minus the costs and proportionate profits attributable to the processes beyond the kiln feed stage.

There is no direct evidence in the present case of the processing costs both prior to and after the kiln feed stage, but it has been stipulated that "[t]here is no disagreement between the parties as to the correctness of the basic costs used by the parties to make their computations". In order to arrive at the proper depletion allowance in accordance with the above-quoted Treasury Regulation, the total gross income, that is, the total sales of the finished cement, must first be ascertained. Then there must be subtracted from this total gross income two things, (1) the total post-kiln feed costs and (2) the proportionate profits attributable to the processes beyond the kiln feed stage.

Computing the post-kiln feed costs should be a simple problem since from the stipulation it appears that there is no substantial disagreement between

2. Section 302(b) of the Public Debt and Tax Rate Extension Act of 1960, 74 Stat. 290, 293 (1960), 26 U.S.C.A. § 613 (c) (2); 613(c) (4) (F), as made applicable to tax years in issue in this case by Section 4 of P.L. 86–781, 74 Stat. 1017, 1018, (1960), 26 U.S.C.A. § 613, Notes.

3. Treasury Regulation 118, § 39.23(m)–1 (e) (3), published under the 1939 Code and applicable to taxable years after 1951. This regulation was made applicable to the 1954 Code years by T.D. 6091, 1954–2 Cum.Bull. 47. The 1951

tax return in dispute here is governed by the corresponding provisions of Treasury Regulation 111, § 29.23(m)–1(f) (1943).

4. Although the treasury regulation uses the phrase, "the representative market or field price", the actual price of the finished cement is being used in the present case because the government has stipulated that the "prices charged by the plaintiff for its cement in bulk and in bags * * * were substantially uniform with the prices quoted by other cement manufacturers in the Lehigh Valley * * *"

the parties as to the amount of these costs. The proportionate profits problem, however, is not so simple. My solution to this problem is to divide profits in the same proportion as are the costs. To do this the costs of all the processes, both the pre-kiln and post-kiln feed costs, must be totalled. The total post-kiln feed costs then must be ascertained. From these two figures a fraction must be created in which the total post-kiln feed costs will be the numerator and the total of all the costs, both pre-kiln and post-kiln, will be the denominator. Applying this fraction to the total gross profits the proportionate profits attributable to the processes beyond the kiln feed stage will be ascertained. This post-kiln profit figure will then be added to the post-kiln cost figure and the total subtracted from the total gross income (total sales). The resulting figure will be the base figure to use to ascertain the proper depletion allowance. See United States v. Henderson Clay Products, 324 F.2d 7, 9 (5th Cir.1963), cert. denied 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964); Riddell v. California Portland Cement Co., 330 F.2d 16 (9th Cir.1964); Standard Lime and Cement Co. v. United States, 329 F.2d 939 (Ct. Claims, 1964).

In the present case there is a dispute over whether certain of plaintiff's processes shall be classified as pre-kiln feed or whether they shall be classified as post-kiln feed. These disputed processes are:

(1) The use of limestone, iron ore and sand purchased by plaintiff and blended with its own quarried cement rock to produce the required chemical composition of portland cement.

(2) The loading of bulk portland cement into vehicles for transportation to plaintiff's customers and the packaging of plaintiff's cement into bags.

(3) The activities necessary to sell plaintiff's cement, e. g. advertising, employment of salesmen, etc.

(4) The sale to plaintiff's customers of certain quantities of mortar cement (not portland cement) which plaintiff purchased from other cement manufacturers.

(1) *Cost of Purchased Additives*

Plaintiff's cement rock in its pure state is not suitable for making portland cement. In order to make portland cement from it, plaintiff was required to add to it a certain amount of limestone, iron ore and sand. Plaintiff did not mine these materials itself, but purchased them from other miners. These materials were blended with plaintiff's crushed cement rock prior to the time that the entire mass was put into the kiln.

In my opinion the cost of physically blending these additives with plaintiff's cement rock is part of the cost of plaintiff's "mining", but the cost of the additives themselves, i. e. what plaintiff had to pay other miners to get these additives, cannot be included in plaintiff's mining costs.

Revenue Ruling 290, 1953–2 Cum. Bull. 41, from which the 1960 Amendment cut-off point is derived clearly sets forth the distinction:

"Blending with other materials after crushing and grinding, such as that occurring at the kiln feed bins, is excluded from 'ordinary treatment processes' but where mixing * * * occurs before or during crushing and grinding, it will be considered as incidental to such processes.

"The gross income for percentage depletion purposes must of course be computed separately with respect to each component mineral, notwithstanding any such mixing * * *."

The 1960 Amendment itself in enumerating certain operations as constituting "treatment processes * * * applied to the * * * mineral" which would be considered mining, listed, among others, cleaning, crushing, grinding, cooling, and sizing; the purchasing

of additives was not so listed. The reason for the distinction is clear. A depletion allowance is a matter of legislative grace and is granted only to those taxpayers who have an economic interest in a mineral in place which is depleted by mining. The purchasers of a mineral, such as plaintiff, do not have the requisite economic interest to justify a depletion allowance on the purchased mineral. Riddell v. California Portland Cement Co., 330 F.2d 16 (9th Cir.1964).

### (2) *Loading and Packaging of Finished Cement*

Of course, loading and packaging of finished cement would not take place if there were no quarrying of cement rock and in this sense loading and packaging relate to pre-kiln feed processes. However, it is obvious that the loading and packaging take place after the kiln feed stage and that they are post-kiln feed processes in point of time. It should be noted also that while Congress included "loading for shipment" in the specific list of "treatment processes considered as mining" in the case of coal, sulphur, iron ore and certain other ores and minerals, it omitted the phrase "loading for shipment" when it came to the section of the statute where the treatment processes to be regarded as mining were considered in the case of cement rock. Also it should be noted that in the Congressional debate in reference to the 1960 amendment, Senator Gore, after whom the amendment is named, stated:

"\* \* \* [T]he proposed amendment changes the definition of 'mining' to preclude the interpretation

of the term as including operations involved in \* \* \* the packaging and shipping of the finished product." [5]

■■ For these reasons it must be concluded that the costs of loading and packaging plaintiff's finished cement are post-kiln feed costs rather than pre-kiln feed costs.[6] Standard Lime and Cement Co. v. United States, 329 F.2d 939 (Ct. of Claims, 1964). See United Salt Corp., 40 T.C. 359, 368 (1963); North Carolina Granite Corp., 43 T.C. 149 (1964).

### (3) *Plaintiff's Selling Activities*

■ There can be no "gross income from mining" if there is no sale of the product and there can be few sales without selling expenses.[7] The government does not appear to contend that plaintiff's selling expenses are unusual in the cement industry or that they would not be incurred by a non-integrated miner of cement. Moreover, the government concedes that plaintiff's administrative expenses such as office salaries and expenses are incurred for the benefit of both plaintiff's mining and manufacturing operations and, that accordingly, these administrative expenses can be allocated between the mining and manufacturing phases of operations in the proportion that the cost of the mining processes before and after the kiln feed point bear to the total direct processing costs. There appears to be no substantial reason why the two types of expenses should be accorded different treatments. Accordingly, selling expenses like administrative expenses will be apportioned between mining and manufacturing costs in the proportion that

---

5. 106 Cong.Rec. 13240 (1960) (Remarks of Senator Gore)

6. Plaintiff contends that the government in its computations has excluded from gross income a figure deemed to represent the proportionate profits attributable to the sale of packaged cement in bags, despite the fact that plaintiff in fact charged its customers a "premium" for the bags which was less than its cost of purchasing the bags. Of course no

constructive profit can be apportioned to sales on which plaintiff sustained an actual loss.

7. Although the parties have not stipulated as to what activities are classified as selling expenses, it appears from the government's exhibit that the classification includes items such as salesmen's salaries and expenses, advertising and trade association expenses.

the direct processing costs up to the kiln feed stage bear to the direct processing costs after the kiln feed stage. United Salt Corp., 40 T.C. 359 (1963); North Carolina Granite Corp., 43 T.C. 149 (1964), n. 13.

### (4) Sale of Purchased Mortar Cement

Mortar cement is quite different from portland cement. It had nothing to do with plaintiff's portland cement business except that as a convenience to customers plaintiff bought mortar cement and sold it to customers who requested it, plaintiff making very little profit on the mortar cement transactions. There is hardly any way to relate the purchase and sale of mortar cement to plaintiff's mining, manufacturing and selling of portland cement except to recognize that having mortar cement on hand as a convenience to a few portland cement customers could create a little good will which might help to sell portland cement.

But this court is concerned here with ascertaining taxpayer's gross income from the mining of cement rock not its gross income from the purchase and resale of mortar cement. More particularly, the job at hand is to segregate taxpayer's processing operations into pre-kiln and post-kiln processing classifications. Plaintiff's purchase and resale of mortar cement mined by other operators is no more a "treatment process" connected with the mining of cement rock than would be the purchase and resale of television sets by a miner to its customers as a merchandising or public relations scheme. Consequently so much of taxpayer's gross income as is attributable to the operation of selling mortar cement must be completely excluded from the computations involved in determining plaintiff's depletion base. The cost of purchasing mortar cement is neither a pre-kiln feed or post-kiln feed cost of mining cement rock. The gross income plaintiff received from the sale of mortar cement is not part of its gross income from mining.

All the necessary findings of fact in the case have been stipulated and are adopted by the court as its findings of fact. It has been agreed that there is no market or representative market price for cement rock at the kiln feed stage of the production of portland cement, and that there is no market or marketable product until the final product, portland cement, is produced. The court so finds as a fact.

The parties are directed to recompute plaintiff's tax and to submit a proposed order for judgment in accordance with the foregoing opinion within thirty days hereof.