THE NORTH CAROLINA GRANITE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93770. Filed November 9, 1964.

*Edgar J. Goodrich* and *Ira S. Siegler*, for the petitioner.
*Harvey S. Jackson* and *John L. Ridenour III*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioner's income taxes for the years 1956, 1957, and 1958 in the respective amounts of $29,962.33, $17,188.20, and $30,317.73. Petitioner in its amended petition claims overpayments for the same years of $58,564.10, $3,049.12, and $37,512.28, respectively.

The only issues remaining for decision are the following:

(1) What was petitioner's "gross income from the property" for computing percentage depletion with respect to crushed granite sold for use as poultry grit?

(2) Is petitioner, in calculating "taxable income from the property" for the 50-percent limitation on percentage depletion, entitled to make adjustments in its expense deductions to reflect annual inventory changes?

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner, a corporation organized under the laws of Delaware and having its principal place of business in Mount Airy, N.C., filed its income tax returns for the years in question with the district director of internal revenue for the district of North Carolina. It is engaged in the business of extracting and selling granite from its large quarry in Mount Airy. Petitioner's quarry produces a uniformly light-gray granite known as White Mount Airy granite.

### Issue 1

### FINDINGS OF FACT

During all relevant times petitioner sold its granite as dimension stone, ornamental stone, riprap, rubble, poultry grit, roofing stone, gravestone, and road material. The granite sold as dimension stone and ornamental stone either was sold directly from petitioner's quarry in the form of rough blocks or was processed in petitioner's stone-cutting and stone-sawing sheds. The granite which petitioner sold as riprap [1] and rubble [2] was sold directly from its quarry without processing at the cutting sheds. The granite sold for use as poultry grit, roofing stone,[3] gravestone,[4] and road material was processed in petitioner's crusher.

"Poultry grit," or "grit," is a term applied in the poultry-raising industry to stone that will not be attacked or dissolved by the digestive juices of poultry. Its function is to grind food in the gizzards of poultry, and simultaneously to strengthen the digestive system of the bird. Grit serves to increase feed efficiency,[5] develop a stronger, larger, and more efficient digestive system, increase resistance to disease, and reduce bird mortality.

Poultry have no teeth. They "chew" their food by grinding it up in the organ known as the gizzard, which is the muscular part of

---

[1] "Riprap" is a term used to describe large, irregular pieces of stone used to protect shorelines and riverbeds against the water.

[2] "Rubble" is a rough quarried material, of a size suitable for handling by one or two men, used in rough retaining walls and similar structures.

[3] "Roofing stone" is uniformly sized crushed stone which is mixed with hot asphalt and spread on a roof to give substance to the roof.

[4] "Gravestone" is crushed stone applied in a thick layer over the top of graves to improve the appearance of a graveyard.

[5] "Feed efficiency" is measured by the number of pounds of meat or eggs produced per pound of feed consumed.

the stomach. Grit is fed to the bird along with its food. As the rhythmic contractions of the gizzard apply pressure to the material inside it, the food is broken down into small particles by the grit. It is then possible for enzymes to break down the complex molecules of the food into simple nutrients which can be absorbed through the walls of the digestive system. Since enzymes operate only upon the surface of food, it is important that the food be rapidly broken down into small particles, to increase the surface area, otherwise much of the food will pass through the relatively short digestive system without being absorbed and will be excreted. This would result in higher costs because of reduced feed efficiency.

Besides grinding the food, grit also stimulates the gizzard to contract, further improving digestion. This muscle exercise helps develop a strong gizzard, which enables the rest of the digestive system to become well developed.

Not all substances are equally well suited for use as poultry grit. The material must be insoluble in the digestive juices of poultry, or it would not remain in the system long enough to perform its function as a grinding agent. For similar reasons, a good grit must not be friable; otherwise, the pressure of the gizzard contractions would break it into very small pieces. It would then pass out of the gizzard and be excreted without grinding the food.

In addition, a good grit must not adversely affect a bird's bodily chemistry, by adding harmful or toxic elements, by causing the elimination of necessary elements through chemical combination, or by changing the acid concentration of the stomach. It must have rough, abrasive surfaces, to achieve maximum grinding efficiency.

Finally, a good grit must be of a color which will appeal to the bird. Experiments by poultry scientists have established that chickens and turkeys have color preferences in grit. It has been found that the birds prefer light, metallic colors. If the material does not have a color which is preferred by the birds, they will refuse to eat it and thus will not get enough grit.

As early as 1930, poultry scientists concluded that light-gray crushed granite was the best material for poultry grit. At the time of trial, no better substance had yet been discovered. Producers of poultry feed advise their customers to use insoluble granite grit in order to obtain high feed efficiency. Petitioner's granite is a light-gray insoluble granite and is ideal for poultry grit. There are only four or five commercial producers of poultry grit in the United States. All produce light-gray insoluble granite.

Road material is used in the building of streets and highways. To be suitable for use as road material, a stone need only possess strength, i.e., nonfriability, and bulk. It must also be cheap. Suitable ma-

terials are widely available, there being thousands of producers in the United States and several in the immediate vicinity of petitioner's quarry. Stone other than granite makes quite satisfactory road material.

Processing in the crusher is not the only step in the production of crushed granite. After the stone passes through the crusher, it is screened into several different sizes. At least 90 percent of the product of the crushing process will remain on a No. 45 screen (U.S. Standard Sieve Series).

The crushing and screening processes yield poultry grit and road material simultaneously. The crushed granite destined for use as poultry grit, of which there are five sizes, is fed from the screens' downspouts to the bagging room. That which is to be used as road material is recombined with other sizes and sent through a chute to a pile outside the crusher building. Roadstone is composed of various sizes of crushed stone, the precise formula used in North Carolina being determined by specifications of the State Highway Commission. Crushed granite of a size suitable for use as poultry grit is included in the mixtures used for roads.

The crushing and screening processes applied in petitioner's crusher are the processes ordinarily applied by producers of crushed granite. The crushed granite produced by petitioner's crusher is in the form in which crushed granite is normally sold and is salable for use as poultry grit, gravestone, roofing stone, or roadstone without requiring any additional processing to obtain one from the other.

When crushed granite is sold for use as roadstone, it is sold and shipped in bulk. When sold as poultry grit, it is packed in bags of 80-, 50-, or 25-pound capacity. Of petitioner's total production of grit, about two-thirds was shipped in 80-pound bags, one-third in 50-pound bags, and 1 percent in 25-pound bags.

Petitioner's expenses of bagging crushed granite during the taxable years were as follows:

|  | 1956 | 1957 | 1958 |
|---|---|---|---|
| Cost of bags | $72,044.89 | $59,414.21 | $58,937.63 |
| Bagging-machine rental | 1,091.22 | 1,071.60 | 1,632.48 |
| Bagging labor | 10,903.69 | 10,362.31 | 10,125.06 |
| Total bagging costs | 84,039.80 | 70,848.12 | 70,695.17 |
| Grit sales—tons | 31,270.77 | 28,318.32 | 26,162.07 |
| Bagging cost per ton | $2.687 | $2.502 | $2.702 |

Although petitioner made no bulk sales of poultry grit in the years in question, it nevertheless maintained a price for bulk shipment and determined the price of bagged grit by a fixed schedule of additions to the bulk price. The amount of the differential depended upon the

size of the bags. If 80-pound bags (25 per ton) were used, the price was $2 per ton higher than the bulk price. The difference between bulk and bagged prices was $2.50 per ton for 50-pound bags (40 per ton), and $5 per ton for 25-pound bags (80 per ton). When gravestone or roofing stone was sold in bags, petitioner charged $2 per ton more than the bulk price.[6]

Some of petitioner's grit was packed and shipped in bags furnished by the purchaser. In consideration for supplying its own bags, the Mayo Shell Co. of Houston, Tex., received a discount of $2 per ton from the price of grit shipped in petitioner's bags.

Petitioner adopted its schedule of bagging surcharges around 1948 and had not changed it as of the time of trial. The charges were originally imposed to allow petitioner to recover the costs of bagging. Petitioner did not seek to make a profit from its bagging operation.

During the taxable years, petitioner's cost of bagging grit in each of the three sizes of bags averaged about 50 cents per ton more, for each size, than its scheduled charge for shipping in that size bag.[7] However, since petitioner sold no grit in bulk, it was able to avoid any loss by allocating a portion of its "bulk rate" to recouping this 50 cents per ton of bagging costs. Thus, petitioner received revenue attributable to bagging equal to its costs of bagging.

Petitioner has been selling a portion of its crushed granite to the poultry industry for use as grit since about 1931. Its first sale was a transaction which had been solicited by the customer, Security Mills of Knoxville, Tenn., rather than by petitioner as seller. Approximately 1 year prior to this first sale, petitioner had received a letter from O. B. Kent, a poultry scientist who performed some of the early work which led to the recognition of light-gray granite as an excellent material for use as grit. Kent had advised petitioner that there was a commercial need for insoluble granite grit and that petitioner's granite was suitable for the purpose. Petitioner ignored Kent's suggestion that it investigate the commercial possibilities of selling its crushed granite to the poultry industry for use as grit and did nothing further in this regard until contacted by Security Mills.

During the taxable years involved in this proceeding petitioner sold granite for use as poultry grit in 29 States in the east, south, midwest,

[6] There was no evidence as to the size of the bags in which gravestone and roofing stone were sold.

[7] We accept the method used by petitioner on brief as reasonably accurate to determine the average bagging costs per ton of grit shipped in each of the three sizes. However, the result of petitioner's computation of the average labor and rental cost per operation is higher than it should be, because petitioner used 25 as the number of bagging operations per ton. This is true only for 80-pound bags. Since there are more operations per ton in packaging 50- and 25-pound bags, the average number of operations per ton should be about 30.5 instead of 25. Thus the average cost per operation should be lower—about $0.01345. This would make the total cost of bagging $2.49, $2.96, and $5.42 for 80-pound, 50-pound, and 25-pound bags, respectively.

and as far west as Colorado and Idaho. Most of the grit sold was shipped in bags carrying petitioner's oval trademark and the trade name of its grit, Gran-I-Grit. Some was shipped in bags supplied by the purchaser.

Petitioner's gross receipts from sales of all forms of granite for 1956, 1957, 1958 were $1,719,655.77, $1,568,115.58, and $1,786,750.97, respectively. Its principal source of revenue was sales of finished cut stone for buildings, memorials, bridges, and curbing; these products accounted for about 70 percent of gross sales.[8]

The number of tons of crushed granite sold by petitioner for use as poultry grit, the total sales proceeds received by petitioner from such sales, and the average price per ton in each of the taxable years were as follows:

*Crushed granite sold for use as poultry grit*

| Year | Number of tons sold | Total sales proceeds | Average price per ton |
|---|---|---|---|
| 1956 | 31,270.77 | $292,734.57 | $9.3613 |
| 1957 | 28,318.32 | 246,015.71 | 8.6875 |
| 1958 | 26,162.07 | 261,698.51 | 10.0030 |

Petitioner's sales of poultry grit provided its second most important source of revenue.

The number of tons of crushed granite sold by petitioner for use as roadstone, the total sales proceeds received by petitioner from such sales, and the average price per ton in each of the taxable years were as follows:

*Crushed granite sold for use as roadstone*

| Year | Number of tons sold | Total sales proceeds | Average price per ton |
|---|---|---|---|
| 1956 | 54,700.39 | $66,143.66 | $1.2092 |
| 1957 | 110,799.83 | 130,053.89 | 1.1738 |
| 1958 | 103,066.72 | 159,347.64 | 1.5461 |

Petitioner spent approximately one-fourth to one-third of its advertising expenditures, or $10,000 to $12,000 per year, to advertise its grit during the period 1956–58. Petitioner employed only one sales person, V. T. Currier. Aside from any salary paid to Currier in addition to commissions on sales, petitioner's total selling and advertising expenses attributable to grit during 1956, 1957, and 1958 did not exceed $23,000, $21,000, and $24,000, respectively.[9]

---

[8] During the taxable years, petitioner sold unprocessed rough blocks of granite for not less than $1.35 per cubic foot. Since there are approximately 12 cu. ft. of granite per ton, the minimum price per ton of granite in this form was about $16.

[9] These figures were derived from the schedule of selling expenses on petitioner's income tax returns, Exhibits 1–A, 2–B, and 3–C, as follows: One-third of the advertising expense was added to that proportion of commissions and other selling expenses which sales of grit bore to total sales.

The market for road material is characterized by intense price competition on the part of the producers. The cost of transportation from quarry to jobsite is a very important factor. During the taxable years, petitioner made no sales of crushed granite for use as roadstone beyond 35 miles from its quarry, and most such sales were made within 10 miles of the quarry. There is an abundance of suitable road material. Most physical and all chemical properties which make petitioner's crushed granite valuable to poultry raisers are unimportant to the roadbuilding industry.

Crushed light-gray granite is much more valuable when used as poultry grit than when used as road material. The economic markets for poultry grit and roadstone are independent of one another, and the prices charged by the commercial producers of light-gray granite grit are wholly unrelated to prevailing local prices for road material. Because there are only a few sources of supply of light-gray granite, and because this material is uniquely suited for use as poultry grit, petitioner can command a much higher price for its crushed granite from the poultry industry than from the roadbuilding industry.

On its income tax returns for 1956, 1957, and 1958, petitioner used its gross receipts from sales of poultry grit as the "gross income from the property" in calculating its deduction for percentage depletion of crushed granite sold for use as poultry grit.

Respondent disallowed a portion of the depletion deduction claimed by petitioner in each of the years 1956–58. He recomputed "gross income from the property" with respect to sales of poultry grit by first determining for each year the average price per ton received by petitioner for crushed granite sold for use as road material, and then multiplying that figure by the number of tons of grit sold during the year.

OPINION

The major issue confronting us is the proper determination of petitioner's "gross income from the property" for the purpose of computing the deduction for percentage depletion with respect to crushed granite sold for use as poultry grit. Petitioner contends we should use its actual sales receipts reduced by the *extra charges* it imposed for shipping in bags. In the alternative, petitioner would have us reduce the sales receipts by the *cost* of shipping in bags. Respondent argues that the annual average selling price of crushed granite sold for use as road material represents the price petitioner would have received if it had sold all its crushed granite in bulk prior to the application of any nonmining processes. (Respondent takes the position that, if we should reject his main contention, we should adopt petitioner's alternative contention.) We agree with petitioner's alternative argument.

156

The deduction for percentage depletion is governed by section 613 of the 1954 Code,[10] the pertinent portions of which are set forth in the footnote. The statutory provisions defining "gross income from the property" have recently been interpreted by the Supreme Court in *United States* v. *Cannelton Sewer Pipe Co.*, 364 U.S. 76 (1960), and *Riddell* v. *Monolith Portland Cement Co.*, 371 U.S. 537 (1963) (per curiam).[11]

In *Cannelton*, the taxpayer manufactured vitrified sewer pipe, flue lining, and related products from the fire clay and shale it extracted from its underground mines. Although there was a substantial local market for raw fire clay and shale, the high costs of underground mining prevented taxpayer from profitably competing with minerals from shallower mines. Taxpayer argued that its "gross income from the property" was its actual receipts from sales of finished articles. The Court of Appeals, affirming the District Court, agreed with the

[10] SEC. 613. PERCENTAGE DEPLETION.

(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). * * *

(b) PERCENTAGE DEPLETION RATES.—* * *

     \*       \*       \*       \*       \*       \*       \*

(6) 15 percent—all other minerals (including, but not limited to * * * granite * * *), except that * * * the percentage shall be 5 percent for any such other mineral when used, or sold for use, by the mine owner or operator as riprap, ballast, road material, rubble, concrete aggregates, or for similar purposes. * * *

(c) DEFINITION OF GROSS INCOME FROM PROPERTY.—For purposes of this section—

(1) GROSS INCOME FROM THE PROPERTY.—The term "gross income from the property" means, in the case of a property other than an oil or gas well, the gross income from mining.

(2) MINING.—The term "mining" includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. * * *

     \*       \*       \*       \*       \*       \*       \*

(4) ORDINARY TREATMENT PROCESSES.—The term "ordinary treatment processes" includes the following:

(A) in the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment;

(B) in the case of sulfur recovered by the Frasch process—pumping to vats, cooling, breaking, and loading for shipment;

(C) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment;

(D) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores; and

(E) the pulverization of talc, the burning of magnesite, and the sintering and nodulizing of phosphate rock.

[11] Sec. 114(b)(4)(B), 1939 Code, involved in both *Cannelton* and *Monolith*, is substantially the same as the provisions of sec. 613(c) quoted in fn. 10, *supra.*

taxpayer for the reason that the taxpayer could not sell its raw minerals at a profit and thus did not have a *commercially* marketable product. *Cannelton Sewer Pipe Co.* v. *United States*, 268 F. 2d 334 (C.A. 7, 1959).

After carefully reviewing the legislative history, the Supreme Court reversed. It rejected the view that "the 'commercially marketable mineral product" had to be marketable at a profit. The Court found that—

the substantial tonnage being sold in a raw state provides conclusive proof that, when extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption—in short, they have passed the "mining" state on which the depletion principal operates. * * * Depletion, as we have said, is an allowance for the exhaustion of capital assets. It is not a subsidy to manufacturers or the high-cost mine operator. The value of respondent's vitrified clay products, obtained by expensive manufacturing processes, bears little relation to the value of its minerals. The question in depletion is what allowance is necessary to permit tax-free recovery of the capital value of the minerals.

* * * Ever since the first percentage depletion statute, the cut-off point where "gross income from mining" stopped has been the same, *i.e.*, where the ordinary miner shipped the product of his mine. * * * As we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned. [364 U.S. at 86–87]

The *Monolith* decision reaffirmed and applied the principles of *Cannelton*. The taxpayer mined limestone, which it then crushed and manufactured into cement. The lower courts granted the taxpayer a depletion allowance based on its actual income from finished cement products. The Supreme Court held that *Cannelton* controlled, and that "gross income from the property" was "its constructive income from crushed limestone, rather than [its actual income] from finished cement" 371 U.S. 537, 539. Accordingly, the decision of the Court of Appeals was reversed.

Having stated the controlling principles, we must now apply them to the case before us. It has been stipulated and we have found that the crushing and screening processes applied in petitioner's crusher are the processes ordinarily applied by producers of crushed granite. At this stage the mineral is in the form in which crushed granite is normally sold and is salable for use as poultry grit.

After the screening process, the crushed granite destined for sale as poultry grit is sent through spouts into the bagging room. We hold, as to this portion of petitioner's crushed granite, that "mining" ceases when the crushed granite reaches the bagging room, and that petitioner's "gross income from the property" is the amount it would have received if it had sold the mineral in bulk at this stage.[12] *United*

---

[12] It does not appear that the value at this point is materially different from the value after screening but before transfer to the bagging room.

*States* v. *Cannelton Sewer Pipe Co.*, *supra; Standard Realization Co.* v. *United States*, 289 F. 2d 247 (C.A. 7, 1961) ; *United Salt Corporation*, 40 T.C. 359 (1963), on appeal (C.A. 5).

Apparently, the parties are in substantial agreement up to this point. They disagree strongly, however, as to the amount which petitioner would have realized from sales of its product at this cut-off point. It is petitioner's contention that this amount can most accurately be determined by subtracting the charges it imposed for shipping grit in bags from the actual receipts from sales of bagged grit. In the alternative, petitioner would subtract bagging costs from the sales receipts. Petitioner asserts that the price at which it sells crushed granite to roadbuilders is wholly unreliable as an indication of the price it would have received from poultry raisers for grit sold in bulk.

Respondent's theory can best be presented by the following excerpts from his briefs:

The respondent submits that the value of the crushed stone sold in bulk [for use as road material], *i.e.*, the annual average selling price thereof as stipulated represents the proper amounts to be utilized in determining "gross income from the property." Respondent takes this position not only because the crushed granite is petitioner's first marketable product not requiring some kind of additional processing, but because in addition to the bagging costs involved (which includes [sic] bagging labor, bagging machine rental, and the cost of bags) in selling crushed stone as poultry grit there obviously are other costs involved. Among these other costs are advertising expense, trademark expense and the costs of goodwill acquired through the years. When crushed stone is bagged and sold for $9.00 or $10.00 per ton and the same crushed stone is sold unbagged for $1.20 to $1.54 per ton a considerable part of the price differential is patently attributable to intangibles such as goodwill and trademark and sales organization expense. That this is so is obvious when we consider the fact that although we are concerned with crushed granite (whether sold for use as poultry grit or sold for use as road material) the value of it when sold in bags for use as poultry grit bears little relationship to the value of it when sold unbagged as road material.

In truth, respondent contends that what petitioner was in effect doing was converting his [sic] crushed stone into a more expensive product by bagging it in "Gran-I-Grit" bags and by doing a real job of advertising and selling and that petitioner should be considered as merely selling its first marketable product, crushed stone, to itself for further processing and sale as poultry grit.

* * * it is respondent's position that the price obtained from the poultry raisers *is* attributable to value added by additional processing. * * *

It is apparent that respondent's argument rests in large measure upon his conclusions that the high price received by petitioner for poultry grit is chiefly attributable to "nonmining processing" in the form of advertising, goodwill, trademark, and selling expenditures, and that, absent such "processing," bulk poultry grit would command a price no higher than crushed granite sold for use as road material. The record not only fails to support these conclusions, but it convinc-

ingly establishes that the price of grit reflects the higher value of crushed granite when *used* as poultry grit.

That such an end-use test is valid is best exemplified by the fact that it was employed by the Congress in section 613(b)(6), *supra*, of the controlling statute where the 15-percent depletion rate on granite was reduced to a 5-percent rate "for * * * such * * * mineral when *used*, or sold for *use*, * * * as * * * road material." (Emphasis supplied.)

Even if a case should arise in which selling and advertising expenditures were of such a nature and magnitude that we would hold any value added thereby excludable from "gross income from mining," [13] this surely is not such a case. The record shows that petitioner had only one salesman, V. T. Currier, during the taxable years. Aside from Currier's salary, if any,[14] selling expenses (including advertising and commissions on sales) attributable to grit did not exceed $23,000, $21,000, and $24,000 in the respective years 1956, 1957, and 1958. Since petitioner sold not less than 26,000 tons of granite grit in each of the years before us, selling expenses (excluding bagging costs) were less than 95 cents per ton of grit, or roughly 10 percent of the selling price. These expenditures appear to have been reasonable and we are persuaded that they were not responsible for the large price differential between poultry grit and roadstone, a price differential which, excluding bagging costs, was at least $5 per ton in each of the years before us.

The record as a whole refutes any assertion that petitioner's trademark or goodwill contributed substantially to the value of crushed granite sold as poultry grit.

We reject respondent's argument that substantial value was added to crushed granite by nonmining processing.

In applying the predecessor of section 613 to the facts in *Cannelton*, the Supreme Court stated: "The question in depletion is what allowance is necessary to permit tax-free recovery of the capital value of the minerals." 364 U.S. 76, 86. In that case the Court refused to base the taxpayer's depletion allowance on actual receipts from sales of its finished products, since expensive manufacturing processes intervened between the mining cutoff point and sales to customers.

---

[13] As far as we are aware, this is the first case in which respondent has even argued for such a result. Reasonable selling expenses are normally considered as costs of mining, not as processing in addition to mining. See sec. 1.613-4, Income Tax Regs. We do not mean to express any opinion as to whether or not we would accept respondent's argument if made in a case where selling and advertising expenses were unreasonably large. That decision must await an appropriate case.

[14] The record does not disclose whether Currier received a salary in addition to commissions. The amount of commissions was large, exceeding $50,000 in each of the years 1956–58. However, it was on sales of all products, and persons other than Currier apparently received at least part of these amounts.

In the present case, the only nonmining process applied to the poultry grit after the cutoff point was bagging, the adjustment for which is hereinafter determined. We are convinced and have found as a fact that the price differential between crushed granite sold as roadstone and crushed granite sold as grit represents the higher capital value of the mineral when used as grit.

The requirements for good grit are rigorous; the sources of supply are few. Poultry scientists and feed companies advise poultry raisers to use light-gray crushed granite grit. This combination of factors enables petitioner to obtain consistently high prices for its grit, without postmining processing or excessive advertising.[15] In contrast, the requirements for good road material are few—bulk and non-friability—and the sources are abundant. Consequently, the value of crushed granite as road material is strictly limited by the value of the cheapest available substitute material, whereas there is no satisfactory substitute for crushed granite available to the poultry industry. That the markets for roadstone and poultry grit are so dissimilar [16] helps to explain why petitioner's product commands such different prices when sold to different users.

Congress has made price, i.e., "gross income from mining," the measure of the value of a mineral for depletion purposes. *Standard Lime & Cement Co.* v. *United States*, —— Ct. Cl. ——, 329 F. 2d 939 (1964). We are of the opinion that the "allowance necessary to permit tax-free recovery of the capital value of" petitioner's crushed granite sold for use as poultry grit [17] is the statutory percentage of actual receipts from sales of grit after adjustment for revenue produced by bagging. In so holding, we are not giving petitioner any undue preference over other producers of crushed stone; we are merely granting petitioner a depletion allowance commensurate with the value of its product, as required by the Code and the *Cannelton* decision.

Respondent relies heavily upon our decision in *United Salt Corporation*, 40 T.C. 359 (1963), on appeal (C.A. 5). The taxpayer there mined, crushed, and screened salt. Some of the salt was also pressed into blocks or bricks. The taxpayer sold its product in bulk, in bags, in blocks, and in bricks. In computing its "gross income from the property," the taxpayer deducted its costs of pressing, chemical and

---

[15] It should be recalled that the crushed granite sold to roadbuilders is a mixture of grit sizes plus other sizes. If roadbuilders sought to sell crushed granite to the poultry industry, they would have to incur the expenses of rescreening as well as bagging and selling. This would require investment with little chance of profit—petitioner would undoubtedly cease to sell its product to such persons as soon as they began to compete for the grit market.

[16] Compare the discussion of definition of markets in *United States* v. *du Pont & Co.*, 351 U.S. 377, 393–404 (1956), an antitrust case.

[17] See *United States* v. *Cannelton Sewer Pipe Co.*, 364 U.S. 76, 86 (1960); and p. 157, *supra*.

mineral additives, sacking, cartons, and royalties from its sales receipts.

After finding that the taxpayer's cutoff point was after the screening process, the Court held, sustaining the Commissioner's determination, that " 'gross income from the property' was the total tonnage of all salt sales in each year multiplied by the average sales price per ton of bulk salt sold in that year." 40 T.C. at 370. In reaching its conclusion, the Court emphasized that the average price actually received for bulk sales was a representative average which properly reflected the relevant factors. The Court also stated that it knew of no better way to determine what the taxpayer would have received if it had sold all its salt in bulk. 40 T.C. at 369.

*United Salt* is distinguishable from the present case. In the first place, we have already seen that the average prices at which the present petitioner sold its crushed granite in bulk to roadbuilders were not representative of the value of the product to the poultry industry.[18] Some account must be taken of the actual prices paid for grit. Secondly, in *United Salt* (as in *Cannelton*) substantial value was added to the product of the mine by processing after the cutoff point. That this is so is apparent from comparison of the costs excluded by the taxpayer in *United Salt* in computing its depletion allowance, 40 T.C. at 363, with the added revenue produced by these costs, 40 T.C. at 362. In the case at bar, we have found as a fact that revenues attributable to bagging (the only nonmining process) did not exceed the costs of bagging.[19]

Having decided that petitioner's depletion base is its actual sales receipts reduced by income added by bagging, we now turn to the method of determining the revenue attributable to bagging. Petitioner urges that we merely subtract the amount of the charges it imposed for shipping grit in bags.[20] Respondent contends that, if

---

[18] This factor also serves to distinguish *Standard Realization Co.* v. *United States*, 289 F. 2d 247 (C.A. 7, 1961).

[19] This factor serves to distinguish the instant case from the other cases cited by the parties and disclosed by our own research. Among the latter class of cases, all decided after the briefs had been submitted, are *United States* v. *Longhorn Portland Cement Co.*, 328 F. 2d 491 (C.A. 5, 1964) ; *Standard Lime & Cement Co.* v. *United States*, —— Ct. Cl. ——, 329 F. 2d 939 (1964). For the following reasons, the "proportionate profits method," described in *Standard Lime & Cement Co.*, should not be applicable to this case: (1) The parties have stipulated to the costs of bagging, which we have held to be the only nonmining process. (2) We have found as fact that there were no profits from bagging. (3) The question has not been argued. (4) In view of (1) and (2), the result should be the same as our result. (5) Even if we disregard the stipulation, the only difference could be subtraction of some indirect costs attributable to bagging; this is *de minimis*.

[20] There being no separate record of the total of such charges, petitioner proposes to estimate the amount by multiplying the rate for each bag size by the approximate number of tons of grit shipped in the respective bag size. The approximation would be on the basis of 1 percent shipped in 25-pound bags, 33 percent in 50-pound bags, and 66 percent in 80-pound bags.

actual receipts are to be the starting point, they should be reduced by petitioner's costs of bagging. We agree with respondent.

Petitioner maintained a definite schedule of charges for shipping crushed granite grit in bags. Petitioner's president testified that the schedule of charges in effect during the taxable years had been adopted around 1948 and was intended only to reimburse petitioner for its costs of bagging.[21] There is no reason to disbelieve this testimony. Petitioner's product was crushed granite, not bags. The situation is somewhat analogous to the common practice of computing freight charges as an addition to the basic price of a product.

The record shows, however, that petitioner's costs of bagging during the years before us exceeded its schedule of charges by about 50 cents for each size bag. Although petitioner did not change its schedule of surcharges to reflect the increases in bagging costs, it had little incentive to do so. As long as petitioner did not sell crushed granite to poultry raisers in bulk as well as in bags, it did not have to worry about different profit margins on sales of the same product to similarly situated customers. All that petitioner had to do if it desired to maintain its profit margin in the face of rising costs of bagging was raise the base price of grit.

In short, while petitioner was not deriving any profit from its bagging operation, we are of the opinion that revenues from bagging were sufficient to cover the costs of the operation. Consequently, we have found that bagging revenues equaled bagging costs. This is consistent with our belief that petitioner considered bagging as a service offered to its customers incident to their purchases of grit. One would expect a service of this nature to be offered at cost.

The cases support our conclusion. *United States* v. *Utco Products*, 257 F. 2d 65 (C.A. 10, 1958) ; *United States Pumice Supply Co.*, 36 T.C. 1160 (1961), affd. 308 F. 2d 766 (C.A. 9, 1962). Compare *Winnsboro Granite Corporation*, 32 T.C. 974 (1959), affirmed per curiam 283 F. 2d 307 (C.A. 4, 1960).

We hold, then, that petitioner's "gross income from the property" with respect to crushed granite sold for use as poultry grit is the actual receipts from sales of grit less the costs of shipping in bags.[22]

---

[21] If the fiction in *Cannelton* of constructive sale by the miner of its commercially marketable product to itself as manufacturer is carried to its extreme in this case, it could be argued that the manufacturer would make a profit on bagging, and thus the price it paid for grit would be less than actual price less costs of bagging. However, we have found that the manufacturer here, petitioner as bagger, desires only to break even. *Cannelton* does not require a different result.

[22] In its returns, petitioner deducted bagging costs in computing "taxable income from the property." Since these are nonmining costs and have been eliminated from "gross income from the property," they should also be eliminated from the computation of "taxable income from the property" in computation of the maximum allowance for percentage depletion under Rule 50.

*Issue 2*

FINDINGS OF FACT

Petitioner kept its books and filed its income tax returns on the basis of an accrual method of accounting with inventories.

During the taxable years ending December 31, 1956, and December 31, 1957, the amount of petitioner's inventory of goods on hand increased by $28,875.86 and $69,399.46, respectively. In the year ending December 31, 1958, the inventory decreased by $38,407.67. In reporting its gross profit from sales, petitioner made adjustments in its computation of "cost of products sold" to take account of the changes in inventory. In the years when inventory increased, the amount of the increase was deducted from total production expenses in reaching the final figure for "cost of products sold." When the inventory decreased during the year, the amount of the decrease was added to expenses to reach "cost of products sold." This treatment of changes in inventory was proper under the method of accounting employed by petitioner and clearly reflected income.

In computing "taxable income from the property (computed without allowance for depletion)" for purposes of the statutory [23] limitation on the maximum deduction for percentage depletion,[24] petitioner made no adjustments to reflect changes in inventory during the taxable year. Instead, it simply deducted the total expenses of its mining operations from its reported "gross income from the property." [25] This method of computing "taxable income from the property" was consistently employed by petitioner in its returns and accepted by respondent. It was not based upon a correct application of the principles of accrual accounting with inventories; nor was it consistent with petitioner's manner of reporting gross profit from sales in calculating taxable income. Petitioner did not make application to respondent for permission to change its method of computing "taxable income from the property (computed without allowance for depletion)" on its income tax returns.

---

[23] References are to the Internal Revenue Code of 1954 as applicable during 1956–58.
[24] SEC. 613. PERCENTAGE DEPLETION.
(a) GENERAL RULE.—* * * Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). * * *
[25] If the deductions from "gross income from the property" are to be adjusted, the parties have stipulated the amounts of the adjustments for each of the years involved to be as follows :
1956—deductions reduced by $8,564.21
1957—deductions reduced by $3,866.24
1958—deductions increased by $11,318.13
The corresponding effects on the maximum deductions for percentage depletion in each year would be the following :
1956—maximum deduction increased by $4,282.11
1957—maximum deduction increased by $1,933.12
1958—maximum deduction reduced by $5,659.07

In its petition to this Court, petitioner asserted that it had inadvertently calculated "taxable income from the property" on its returns for the years in question without adjusting its expense deductions to reflect annual changes in inventory. It further claimed that respondent had erroneously failed to make adjustments for such inventory fluctuations.

Respondent answered with a general denial. He contends that petitioner is not entitled to make the adjustments sought without his consent, since they would constitute a change in accounting method.[26]

The petitioner made payments of income tax in the following amounts on the dates indicated:

1956:
    March 18, 1957 _____ $29,342.05  
    June 13, 1957 _____ 29,342.05  
                                                       $58,684.10  
1957:  
    March 17, 1958 _____ 1,524.56  
    June 16, 1958 _____ 1,524.56  
                                                       3,049.12  
1958:  
    March 19, 1959 _____ 18,756.14  
    June 16, 1959 _____ 18,756.14  
                                                       37,512.28

### OPINION

Petitioner kept its books on the basis of an accrual method of accounting with inventories. In computing its cost of goods sold, petitioner subtracted (or added) the net amount by which its inventory had increased (or decreased) during the year from (or to) total production expenses of the year. The result was subtracted from gross sales income to arrive at gross profit on sales. This method of accounting, concededly proper, was also used by petitioner in calculating gross profit from sales on its Federal income tax returns.

Petitioner was entitled to and did claim a deduction for percentage depletion of its granite deposits. Section 613(a) provides that the maximum deduction for percentage depletion "shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion)." In computing "taxable income from the property (computed without allowance for depletion)" for the purpose of this limitation, petitioner did not take any account of yearly changes in inventory. Instead, it subtracted total production expenses from "gross income from the property." As a result, in years such as 1956 and 1957, when its inventory increased, the deductions from "gross income from the property" were too large, and the maxi-

---

[26] Other issues raised by the pleadings have been settled.

mum depletion deduction too small. The converse was true in years like 1958, when inventory decreased.

Petitioner contends it is entitled to recompute its maximum depletion deduction for the years before us by making the appropriate adjustments for changes in inventory. Respondent asserts that this would constitute a change in petitioner's method of accounting without his consent and is accordingly forbidden by section 446.[27]

Our interpretation of the use in section 613(a) of the phrase "taxable income from the property (computed without allowance for depletion)" and our characterization of the computation required by that section compel us to decide this issue for petitioner.

The first limitation upon a depletion deduction was added by the Revenue Act of 1921, wherein it was provided that the deduction for discovery depletion allowed by sections 214(a)(10) and 234(a)(9) should not exceed "the net income, computed without allowance for depletion, from the property upon which the discovery is made." The purpose of the amendment imposing this limitation was "to make it certain that the depletion deduction when based upon discovery value shall not be permitted to offset or cancel profits derived by the taxpayer from a separate and distinct line of business." S. Rept. No. 275, 67th Cong., 1st Sess., p. 15 (1921), 1939–1 C.B. (Part 2) 191. It is clear, in view of the purpose of the amendment, that the "net income" limitation was to be computed in the same manner as the net income upon which the tax was imposed by sections 210, 211, 212, 230, and 232, the predecessors of sections 1, 11, and 63 of the 1954 Code.

When the allowance of the deduction for discovery depletion was reenacted in section 204(c) of the Revenue Act of 1924, an amendment was included which reduced the maximum deduction to "50 per centum of the net income (computed without allowance for depletion) from the property upon which the discovery was made." This change was thought to be necessary because "the limitation imposed by the exist-

---

[27] SEC. 446.  GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

\* \* \* \* \* \* \*

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method ;
(2) an accrual method ;
(3) any other method permitted by this chapter ; or
(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.

\* \* \* \* \* \* \*

(e) REQUIREMENT RESPECTING CHANGE OF ACCOUNTING METHOD.—Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate.

ing law is not a sufficient limitation, and it has been concluded that 50 per cent of the operating profit from the property represents a fair limitation upon discovery depletion." Statement of the Changes Made in the Revenue Act of 1921 by H.R. 6715 (Revenue Act of 1924) and the Reasons Therefor (Mar. 6, 1924), prepared by the Treasury Department for the use of the Senate Finance Committee.[28] It was stated on the floor of the House that—

in many instances they [oil companies] have succeeded in evading the corporation tax through depletion allowances. We have cut the depletion allowance 50 per cent, which will strike the House as quite liberal even then. * * * Every barrel of oil that is taken out, of course, reduces the value of the property remaining. The committee thought that an allowance not to exceed 50 per cent of the net profits was very liberal for depletion. [65 Cong. Rec. 2429 (1924).]

There is nothing in the legislative history of the 1924 Act to indicate that Congress intended to change the method of calculating "net income (computed without allowance for depletion) from the property." On the contrary, it appears that the allowance for discovery depletion was intended to be limited to exactly 50 percent of the taxable income from mineral extraction. This was the balance that was struck between the interest in increasing the revenues and the desire to provide an allowance for the reduction in value of mineral properties.

When percentage depletion was introduced into the tax law by the Revenue Act of 1926, the 50-percent limitation on discovery depletion was also imposed on percentage depletion. See S. Rept. No. 52, 69th Cong., 1st Sess., p. 18 (1926), 1939–1 C.B. (Part 2) 346. It has remained in the statute without substantial change ever since. An early administrative interpretation of the manner in which the limitation on percentage depletion was to be applied stated:

The term "net income" as used in that section [204(c)(2), 1926 Rev. Act] should be taken to mean the net income defined in sections 212 and 232 of the Act [the predecessors of section 63 of the 1954 Code]. [G.C.M. 2315, VI–2 C.B. 21 (1927).]

When the 1954 Code eliminated the term "net income" and substituted therefor the term "taxable income," the terminology of the limitation on the depletion deduction was changed accordingly. No change in substance was intended. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 330 (1954).

This legislative history discloses the continued intention of Congress over a long period of years that the computations under section 613(a) should be made on the same basis as those under section 63. The regu-

---

[28] The report of the Senate Finance Committee stated, "The bill limits discovery depletion to 50 per cent of the operating profit from the property upon which the discovery has been made." S. Rept. No. 398, 68th Cong., 1st Sess., p. 20 (1924), 1939–1 C.B. (Part 2) 280.

lations suggest the same interpretation.[29]  Consequently, we construe section 613(a) as making the method of accounting on the basis of which a taxpayer computes his taxable income (excluding the allowance for depletion) mandatory in calculating the 50-percent limitation on percentage depletion.  Neither the Government nor the taxpayer has any discretion to use a different method of computation.  To construe the statute otherwise would defeat the plain intention of Congress.  In a case such as this, it could result in the maximum depletion deduction in a given year being 10 or 40 or 60 or 100 percent of net profit from mining, depending on the magnitude and direction of the inventory fluctuation.

In this case, it is conceded that petitioner computed its gross profit from sales under the method of accounting which is proper under section 446(a).  It follows from our construction of section 613(a) that the same method, including adjustments for changes in inventories, must be used in computing "taxable income from the property (computed without allowance for depletion)."  The only room left for accounting controversies is the proper allocation of the value of the inventory changes between mining and nonmining processes.  This possibility of conflict has been eliminated by virtue of the parties' stipulation of the amounts of the adjustments.

The computation of "50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion)" is analogous to the computation required by section 170(b), which imposes limits on allowable charitable deductions.  It is not a "method of accounting" as that term is used in section 446.  It is simply a calculation required to be made on the returns from figures appearing on the returns.[30]  Petitioner's method of arriving at the limitation was erroneous; that error appears on the face of the returns.  Mistakes such as this one, tantamount to mathematical errors, may be corrected by a taxpayer.  Cf. secs. 1.461–1(a)(3)(i), 1.451–1(a) (last two sentences), Income Tax Regs.  The fact that petitioner may have repeated its mistake for a number of years does not transform it into a "method of accounting."

Even if petitioner's method of determining its "taxable income from the property (computed without allowance for depletion)" were to be

[29] Sec. 1.613–4 [Income Tax Regs.] Taxable income from the property.

The term "taxable income from the property (computed without allowance for depletion)" as used in section 613 and this part, means "gross income from the property" as defined in section 613(c) and § 1.613–3, less allowable deductions (excluding any deduction for depletion) which are attributable to the mineral property, including allowable deductions attributable to ordinary treatment processes and mining transportation, with respect to which depletion is claimed.  These deductions include administrative and financial overhead, operating expenses, selling expenses, depreciation, taxes, losses sustained, etc. * * *

[30] Certainly, "taxable income from the property" would have no significance but for the limitation on the deduction for percentage depletion.

168

considered a method of accounting, it is the kind which petitioner may change without respondent's consent. Section 446(e) provides that some changes in the manner of reporting income require the consent of the respondent. But section 446(e) (and its predecessors in the regulations) is not applicable where the law specifically prescribes or proscribes a method of accounting or computation; the general requirement of consent to change yields before the more specific commands of the law. See, e.g., *Thompson-King-Tate, Inc.* v. *United States*, 296 F. 2d 290 (C.A. 6, 1961); *Scofield* v. *Lewis*, 251 F. 2d 128 (C.A. 5, 1958); *Crosley Corporation* v. *United States*, 229 F. 2d 376 (C.A. 6, 1956); *Kenosha Auto Transport Corporation*, 28 T.C. 421 (1957); *Catto* v. *United States*, 223 F. Supp. 663 (W.D. Tex. 1963); *Amling-De Vor Nurseries* v. *United States*, 139 F. Supp. 303 (N.D. Calif. 1956).[31] It follows that the cases, such as *Dorr-Oliver Inc.*, 40 T.C. 50 (1963), in which respondent's consent was held necessary are not controlling here.

The fact that petitioner may have committed the same error in prior years is not a sufficient basis for requiring respondent's consent to a correction in the years before us. If the years affected by the correction are still open, respondent can assert any deficiencies on the basis of the proper computations. And since petitioner appears to have taken inconsistent positions before us and in its returns for other years, sections 1311–1314 may be available to permit respondent to recover any lost revenues in closed years.

Reviewed by the Court.

*Decision will be entered under Rule 50*

TIETJENS and RAUM, *JJ.*, dissent.

---

[31] Since sec. 446(e) was intended to codify regulations existing at the time of its enactment in 1954, S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 300 (1954), it should not matter that some of the cases cited in the text involved pre-1954 Code years. See Regs. 118, sec. 39.41–2(c).

