C. Frederick Frick and Patricia B. Frick v. Commissioner.
Frick v. Commissioner
Docket No. 1740-70.
United States Tax Court
T.C. Memo 1972-71; 1972 Tax Ct. Memo LEXIS 187; 31 T.C.M. (CCH) 286; T.C.M. (RIA) 72071; March 22, 1972, Filed C. Frederick Frick, pro se, 3115 N. Menomonee River Pkwy., Wauwatosa, Wis.Robert F. Brunn and John L. Pedrick, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income tax for 1965 and 1966 in the respective amounts of $2,836.57 and $291.42. Some of the adjustments on which these determinations were based have been settled, and the issues remaining for decision are as follows: (1) Whether four real estate lots sold by petitioners in 1965 were held prior to their *189 sale primarily for sale to customers in the ordinary course of petitioners' trade or business within the meaning of section 1221(1); [1]
(2) Whether petitioners' adjusted basis for the lots sold in 1965 include the amounts of special assessments which they paid for 1959 through 1964; and (3) Whether petitioners incurred deductible losses in 1965 and 1966 from participation in a joint venture. Findings of Fact C. Frederick Frick (hereinafter referred to as petitioner) and Patricia B. Frick, husband and wife, filed their joint Federal income tax returns for 1965 and 1966 with the Internal Revenue Service Center, Midwest Region, Kansas City, Missouri. At the time their petition was filed, petitioners were legal residents of Wauwatosa, Wisconsin. The Sale of the Real Estate Petitioner and three other individuals, James Hummert, Jack Schuldes, and Peyton A. Muehlmeier, formed a corporation known as Terra Investments, Inc. (hereinafter referred to as Terra or the corporation), in 1955. Shortly thereafter, Terra acquired 100 lots in the Town and Country Subdivision *190 in Brookfield, Wisconsin. These lots, when acquired by the corporation, were ready for sale, i.e., they were subdivided and the streets were partly graded. To finance the acquisition of the lots, petitioner loaned Terra $60,000, and the corporation immediately set about selling the lots. Some of them were sold to petitioner's fellow shareholders in Terra who were builders, and others were sold through real estate companies operated by the other shareholders. In 1958, a bad year in the local housing industry, petitioner and Jack Schuldes acquired the interests of the other two shareholders in Terra. In 1959, petitioner obtained Jack Schuldes' interest. As a result of these acquisitions, petitioner became the sole shareholder of the corporation. Between 1955 and 1959, the corporation sold 80 of the 100 lots. On May 15, 1959, petitioner caused the corporation to be liquidated and the remaining 20 lots transferred to him. Since that time, petitioner has 287 occasionally listed some of the lots for sale with real estate agents. By the end of 1970, 16 of the lots had been sold as follows: Year of
Number of
Sale
Lots Sold
1959
[1] 5
1960
0
1961
2
1962
0
1963
0
1964
1
1965
4
1966
0
1967
2
1968
1
1969
0
1970
1
*191 All of these lots were sold through the services of real estate agents who obtained purchase proposals and submitted them to petitioner, and who were paid the customary commissions. Petitioner devoted none of his time to attempting to sell the lots, and he incurred no expenses for advertising the property for sale. He has never been in the real estate sales business. In 1965, as shown in the above table, petitioner sold four of the lots acquired from the corporation upon its liquidation. The parties have stipulated that these lots, delineated as Lot 2, Block 1; Lot 4, Block 3; Lot 2, Block 4; and Lot 2, Block 7, each had a cost basis of $2,300 as of the time of the liquidation of the corporation. This cost basis was derived from a "Collateral Agreement," executed by petitioners on February 2, 1968, in connection with the settlement of a prior proceeding in this Court (docket No. 1979-67). The agreement allocates to each of the lots sold in 1965 the sum of $2,300 out of $46,000, the agreed fair market value of the 20 lots which petitioner acquired on the liquidation of Terra. Between 1959, the year of the liquidation, *192 and 1964, special assessments were levied against these four lots in the stipulated amounts of $337.45 for Lot 2, Block 1; $421.04 for Lot 4, Block 3; $588.50 for Lot 2, Block 4; and $323.45 for Lot 2, Block 7. In their Federal income tax returns for 1959 through 1964, petitioners deducted the special assessments as real estate property taxes in the years paid. In their 1965 Federal income tax return, petitioners reported the sale of the four lots for a total net sales price of $17,939.07. Using a cost basis of $1,600 per lot, they reported $11,539.07 as long-term capital gain. Respondent, in his notice of deficiency, determined that gain realized on the sale of the four lots was properly reportable as ordinary income and not capital gain. In computing the amount of gain from the four sales, respondent used a cost basis of $2,300 per lot. This resulted in a determined gain of $8,739.07. Petitioners, in an amended petition filed herein, allege that the basis in the four lots should be increased by the amounts of the special assessments levied from 1959 through 1964. Joint Venture Loss During 1965, petitioner, Paul Jordan (hereinafter referred to as Jordan), and Aileen C. *193 Jordan, as joint venturers, entered into an agreement for the purchase of a lot at 3660 North Teutonia Avenue in Milwaukee, Wisconsin, and for the construction of an office building thereon. Petitioner owned a 70 percent interest in the joint venture and Jordan owned the remaining 30 percent. Construction of the office building commenced in 1965 and by March 1966 was completed sufficiently to permit renting of office suites on the ground floor. The cost of construction of the building with the four suites of offices on the ground floor was $97,245.74. During 1966, beginning in March, the first tenant who leased one of the office suites commenced paying rent to the joint venture. Between March and June 1966, all four tenants took possession of their offices and began paying rent. During 1966, the joint venture received gross rental income on the office building totaling $9,650. No rental income was received prior to 1966. Shortly after the first offices were rented in the building, the joint venture became involved in financial difficulties. On July 21, 1966, the savings and loan association which financed the construction of the building invoked its contract right to have all rents *194 paid directly to it. During 1965 and 1966, the joint venture incurred and paid the following expenses relating to the maintenance and depreciation of the building: *13
Amount
Expense Item
1965
1966
Real Estate Tax
$ 740.69
Interest
$2,000.00
4,543.57
Heat
417.90
Electricity
865.98
Water
32.40 288 *13
Amount
Expense Item
1965
1966
Janitorial Service
$ 1,995.38
Insurance
249.00
Depreciation
1,800.00
Total
$2,000.00
$10,644.92
Disagreements arose between petitioner and Jordan. On December 1, 1966, they agreed to dissolve the joint venture, and Jordan was to acquire petitioner's interest therein. The agreement provided that the transaction was to be closed April 12, 1967. In their 1965 and 1966 Federal income tax returns, petitioners did not report either a gain or loss from the joint venture. In their amended petition filed herein, however, they claimed a joint venture loss of $1,400 for 1965 and $6,900 for 1966; these amounts allegedly represent their share of the total loss of the joint venture in each year. Ultimate Findings of Fact (1) The four lots of real estate sold by petitioner *195 in 1965 were not held primarily for sale to customers in the ordinary course of his trade or business; (2) Petitioner's adjusted basis for the lots sold in 1965 includes the amounts of the special assessments which were paid for 1959 through 1964; and (3) Petitioner incurred deductible losses, representing his share of the joint venture losses, in the amounts of $1,400 in 1965 and $696.44 in 1966. Opinion The first issue for consideration is whether the four lots sold in 1965 were held by petitioner "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221(1). Respondent contends that petitioner's sale of the lots was simply a continuation of the business in which Terra was engaged - that is, sale of the lots - and, consequently, any gain petitioner received therefrom is taxable as ordinary income. Petitioner argues that he was not in the business of selling land, that he received these lots upon liquidation of the corporation, and that thereafter he held them as an investment, selling lots only when a favorable offer was received. Special treatment is given to the taxation of gain derived from the sale of a capital *196 asset. However, section 1221(1) excludes from the definition of a capital asset "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." There is no fixed rule for determining whether particular property sold by a taxpayer was held by him primarily for sale to customers, or as an investment; the issue is a factual one and, necessarily, each case turns on its own precise facts. The Supreme Court, upon considering the statutory provision excluding from the capital asset category property held primarily for sale to customers, stated in Malat v. Riddell, 383 U.S. 569, 572 (1966), that the purpose of the statute - is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. * * * A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in § 1221(1), "primarily" means "of first importance" or "principally." Several factors have been enumerated by the courts for determining whether property was held "principally" *197 for sale to customers. Among them are: (1) The purpose for which the property was initially acquired; (2) the purpose for which the property was held at the time of sale; (3) the activities of the seller with respect to the actual disposition of the land; (4) the frequency, number, and continuity of sales; (5) ordinary business of the taxpayer; and (6) the extent of advertising, promotion, or other active efforts employed in soliciting buyers for the property. See James G. Hoover, 32 T.C. 618 (1959), acq. 1959-2 C.B. 5; D. L. Phillips, 24 T.C. 435, 445 (1955), acq. 1956-1 C.B. 5. After a careful analysis of the entire record, we have concluded that petitioner did not hold the lots sold in 1965 primarily for sale to customers in the ordinary course of his trade or business. While it is true that Terra held its land for sale to customers, petitioner received the land in the liquidation of his investment in that corporation. In some circumstances, it may be reasonable to conclude that a sole shareholder who acquires the assets of a liquidated corporation intends to, and does, continue the business previously carried on by the corporation. *198 However, that is not necessarily true. In the final analysis, 289 the character of the assets received upon dissolution of a corporation for the purposes of section 1221 depends on what the recipient does with them, and not on the use to which they have been put by the corporation. Estate of Theodore Gutman, 18 T.C. 112 (1952), acq. 1952-2 C.B. 2. In the instant case, petitioner did not actively attempt to sell the lots after the corporation was liquidated. He devoted no time or effort to that cause. Moreover, he did not incur any expenses for advertising the lots or in any way promoting their sale. Although five lots were sold in 1959, they were all sold in two transactions, and in both cases the buyers, through agents, approached petitioner. Thereafter, between 1960 and 1965, petitioner sold only three more lots, and in three of those years he sold no lots at all. The evidence is abundantly clear that petitioner was not engaged in selling real estate as a business. His principal business activity involved outdoor advertising and the management of numerous investments. Through the years he has acquired several pieces of real estate which he is holding *199 with the hope and expectation of ultimately realizing the benefit of a gradual appreciation in value over a long period of time, but he has not engaged in the everyday operation of a real estate business. See quotation from Malat v. Riddell, supra.In the light of all this evidence, petitioner's gain from the sale of the lots in 1965 is properly reportable as capital gain. The second issue for consideration concerns the proper treatment of special assessments on the four lots from 1959 through 1964. These assessments were paid and deducted as real estate taxes in those years; petitioner now contends that these amounts should be added to the basis of the lots. Respondent does not contend that the special assessments are not properly an item to be added to basis, but argues that petitioner cannot claim the special assessments as an adjustment to basis, because he deducted those amounts in prior years and the statute of limitations prevents the respondent from going back to the prior years to correct the errors. Respondent's position is predicated on a theory of estoppel, i.e., because petitioner will receive an additional tax benefit in the form of an adjustment to basis *200 when he already has received a benefit from the prior deduction of the assessments, he should be estopped from claiming the adjustment. We cannot agree with respondent's position. The special assessments in question were expenditures "properly chargeable to capital account" for which an "adjustment" of the cost basis must be made. Sec. 1016(a)(1). They were not correctly deducted as taxes. Sec. 164(c)(1). To prevent a double tax benefit for petitioner, respondent's recourse, following the finality of the "determination" in the present case, is to resort to the correction procedures prescribed by sections 1311-1315 and specifically authorized with respect to a basis adjustment by section 1312(7). See generally, North Carolina Granite Corp., 43 T.C. 149, 168 (1964); Kenosha Auto Transport Corporation, 28 T.C. 421, 425 (1957). [2] We find no foundation in the present case for applying a theory of equitable estoppel. See United States v. Albertson Co., 219 F. 2d 920 (C.A. 9, 1955); Salvage v. Commissioner, 76 F. 2d 112, 114 (C.A. 2, 1935).[3]
*201 On brief respondent, relying on the "Collateral Agreement" executed in 1968 in connection with a proceeding in this Court for a prior year, also urges that petitioner was precluded from altering his basis from that stipulated in the "Agreement" because it was designed to settle the basis for the lots. As we read the "Collateral Agreement" it relates only to the value of the lots as of the date of the liquidation of the corporation. It does not refer to the special assessments here in dispute, and there is nothing in it to indicate the assessments were under consideration in that proceeding. The final issue concerning whether petitioner incurred a deductible loss from 290 participation in the joint venture during 1965 and 1966 is purely a factual one. [4] Despite the hostility between petitioner and Jordan and the absence of any real cooperation between the parties to this controversy in reconstructing the results of the abortive joint venture, we think the expenses and other deductions set forth in our Findings have been adequately established. Both parties presented witnesses who testified concerning the income derived from the rental of the building and the expenditures made *202 in maintaining it. In addition, numerous documents were introduced showing the bills incurred for the various items of expenses, including taxes, interest, janitorial service, heat, and other utilities, and testimony was presented with respect to the allowable depreciation. After careful consideration of all the evidence presented, we think our Findings accurately reflect a realistic appraisal of the evidence. [5]
*203 To give effect to our Findings and concessions made by the parties, Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue.↩
1. The five lots were sold in two separate transactions.↩
2. In S. Rept. No. 1622, to accompany H.r./ 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 488 (1954), the changes incorporated in sec. 1312(7) by the 1954 Code were explained, in part, as follows: The type of errors described in the basis provision have been expanded to include the erroneous allowance of a deduction for an expense properly charged to capital account * * *. Thus, if the taxpayer erroneously expenses certain costs which should be capitalized and later successfully contends that such amounts should have been added to the basis of the asset, an adjustment will be authorized under section 1311.↩
3. Respondent cites several Board of Tax Appeals opinions and early opinions of this Court, including Reliable Incubator & Brooder Co., 6 T.C. 919↩ (1946), in which the theory of equitable estoppel was used. These cases are not apposite herein, for they did not involve situations where secs. 1311-1315 were applicable.
4. With respect to 1965, respondent, at trial, conceded that petitioner was entitled to a deduction for interest paid by the joint venture in the amount of $1,400, representing his share in the business. Since it has been found that no income was realized by the joint venture in 1965, our Findings relating to that year reflect a loss of $2,000 of which $1,400 is allocable to petitioner. ↩
5. In making our Finding with respect to the allowable depreciation on the office building, we followed the Guidelines For Depreciation set forth in Rev. Proc. 62-21, 1962-2 C.B. 419↩.employing a useful life of 45 years and the straight-line method, we computed depreciation for 1966 for a 10-month period beginning March 1, the date the first tenant took possession of his office. We do not find convincing petitioner's claim that the depreciation deduction should be computed on the assumption that the building had a shorter useful life.